[Civ. No. 57609. Second Dist., Div. One. July 7, 1980.]

CITROEN CARS CORPORATION, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent.

COUNSEL

Lillick, McHose & Charles, Michael E. Meyer and Nancy G. Morrison for Plaintiff and Appellant.

George Deukmejian, Attorney General, Thomas E. Warringer, Assistant Attorney General, Anne S. Pressman and Ellyn S. Levinson, Deputy Attorneys General, for Defendant and Respondent.

OPINION

NEWMAN (J. M.), J.*—Petitioner Citroen Cars Corporation appeals from a judgment of the Los Angeles County Superior Court denying its petition for a writ of mandate under Code of Civil Procedure section 1094.5 directing respondent Unemployment Insurance Appeals Board[1] to reverse its decision awarding unemployment compensation benefits to certain former employees of Citroen.[2]

*Assigned by the Chairperson of the Judicial Council.
[1]Hereafter Appeals Board.
[2]Hereafter Claimants.

## ISSUE

Is the ruling of respondent Appeals Board that the Claimants were entitled to unemployment compensation benefits supported by substantial evidence?[3]

## FACTS

Petitioner Citroen Cars Corporation ceased its Los Angeles business operations on December 31, 1977, which was the last date on which Claimants were employed.

On December 30, 1977, Citroen wrote to Claimants and its other employees notifying them that their employment was terminated as of the following day because Citroen was ending its Los Angeles operations. In that same letter, each of the two Claimants was advised that he was entitled to two and three months' "severance pay," respectively, based on 1977 salary, to be paid in approximately equal installments, less withholding, on a semimonthly basis during the period applicable (two or three months).[4]

The amount of "severance pay" was dependent on seniority, and was calculated so as to provide one week's pay for each year of employment. The letter went on to state that the payments, described as "severance pay," and the continuation of health and life insurance benefits were being made in full satisfaction of all claims the employee may have against Citroen "arising out of your employment or the termination thereof." The letter concluded with an invitation to the employee to execute a copy and return it to Citroen, indicating agreement with and acceptance of the terms of the offer.

The Claimants did in fact sign the copy of the letter indicating agreement, returned it to Citroen, and received the payments specified for the time periods stated.

---

[3]Code of Civil Procedure section 1094.5, subdivision (c); *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144 [93 Cal.Rptr. 234, 481 P.2d 242].

[4]For claimant Solomon Rbibo, the three-month period would end on March 31, 1978. Claimant Joseph Poltun's two-month period was to culminate on February 28, 1978.

These Claimants and their fellow employees were not covered by a collective bargaining agreement; Citroen previously had no formal severance pay policy. However, it did have an informal policy of paying terminated employees at least one week's severance pay.

Claimants Joseph Poltun on January 1, 1978, and Solomon Rbibo on January 8, 1978, filed unemployment compensation claims against Citroen, asserting they were unemployed after January 1, 1978. Citroen contested their claims and later appealed the award of benefits to Claimants.

## DISCUSSION

■ This case turns on whether the payments made to Claimants by Citroen were wages or compensation for personal services, or were payments within the scope of Unemployment Insurance Code section 1265.[5] If the former, Claimants were not eligible to receive unemployment compensation benefits during the period in question. If the latter, the Claimants were eligible.

During the last quarter of 1977, Citroen did conceive a plan for payments to all 20 employees who were to be terminated effective December 31, 1977, when the employer ceased its Los Angeles business operations. Implementation of the plan commenced with the dispatch of letters to each employee offering "severance pay" in a specific amount to be paid for a specific period based on length of employment, to be paid at specific intervals during the period following termination of employment. Except for the amount of the payments, which varied according to length of service, the contents of these letters, which included language of contract, was identical.

Announcement of the payments was not made in any official sense until December 30, 1977, the date of said letters; this was one day be-

---

[5]Unemployment Insurance Code Section 1265 provides: "Notwithstanding any other provisions of this division, payments to an individual under a plan or system established by an employer which makes provisions for his employees generally, or for a class or group of his employees, for the purpose of supplementing unemployment compensation benefits shall not be construed to be wages or compensation for personal services under this division and benefits payable under this division shall not be denied or reduced because of the receipt of payments under such arrangements or plans.

"This amendment is hereby declared to be merely a clarification of the original intention of the Legislature and is not a substantive change, and is in conformity with the existing administrative interpretation of the law."

fore the last day of work. There were some discussions of the "severance pay" program before that date, however. These payments, then, were not wages for services performed prior to the date they were offered the employees. Citroen argues, too, that the purpose of the payments was not to supplement unemployment compensation benefits, but, in part, to avoid liability for benefits during the time periods in which payments were to be made.

Citroen relies on Appeals Board Precedent Benefit Decision 4 (1967), for the proposition that the payments to Claimants in this case were, like those described in that decision, not paid pursuant to any plan and not intended to supplement unemployment compensation benefits. Such reliance is misconceived. First, that decision pertained to a situation involving one claimant; this case pertains to payments made to all employees of Citroen in Los Angeles, even though only two are Claimants. Indeed, the Appeals Board itself distinguishes between circumstances involving one claimant and those affecting a group or class of employees: "It was not shown that the payments received by the claimant were the result of any plan or system or collective bargaining agreement, *nor was there any showing that such payments were available to a class or group of employees.* (Italics added.) (Precedent Benefit Dec. 4, *supra.*) Second, nowhere in Unemployment Insurance Code section 1265 or in the cases arising out of it does there appear any language defining when a plan shall have been established to come within its terms.

Citroen next asserts that its payments are outside the scope of section 1265 because the Claimants had a vested right to receive them. The Appeals Board made such a finding; however, such vesting as occurred did so when and because the Claimants entered into the agreements offered by Citroen requiring them to surrender any other claims they might have arising out of their employment or its termination.[6]

Such an interpretation of a vested right to receive payments ignores the discussion of this issue in *Powell* v. *California Dept. of Employment* (1965) 63 Cal.2d 103 [45 Cal.Rptr. 136, 403 P.2d 392]. *Powell* points out that the Legislature was aware, in drafting the statute which became section 1265, that administrative agencies advised by the Attorney

---

[6]Unemployment Insurance Code Section 1342 provides in pertinent part: "Any waiver by any person of any benefit or right under this code is invalid." Since Claimants may not waive their rights to benefits, their agreement to do so, even though supported by consideration, is of no legal effect.

General adopted practices defining a vested interest.[7] Since the payments here do not come within the definition of a vested interest prescribed by the Attorney General and adopted by the Supreme Court in *Powell*, and since they were made to all employees in accordance with a plan adopted and implemented by the employer, they would constitute dismissal or severance pay. As such, they are excluded as "wages" within the meaning of the Unemployment Insurance Code. (*Id.*, at pp. 108-109.)

There is, therefore, substantial evidence in the record to support the decision of the Appeals Board that Claimants were unemployed pursuant to Unemployment Insurance Code section 1252, and that the payments made to Claimants were within the scope of section 1265.

The judgment is affirmed.

Lillie, Acting P. J., and Hanson (Thaxton), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 10, 1980.

---

[7]See, 27 Ops.Cal.Atty.Gen. 71 (1956); 28 Ops.Atty.Gen. 40 (1956), in each of which the Attorney General ruled that benefits on termination of employment were not wages where there was no vested certainty that a given employee would receive a benefit. The offer of payments here, styled wage continuation payments by Citroen (apparently because that term was used in Precedent Benefit Dec. 4) was made on December 30, 1977, one day before employment terminated, and required agreement by the employee to give up any claims he had or might have against Citroen arising out of employment or its termination. Although the Appeals Board concluded that a right to receive the payments vested "by reason of the written agreements," those same agreements imposed a condition precedent to entitlement to the payments—waiver of any and all claims. Thus, there was indeed a contingency upon the happening of which an employee would be denied payment—refusing to sign the agreement or otherwise refusing to waive possible or actual claims.