[L.A. No. 31867. Aug. 8, 1985.]

CHARLES EVANS et al., Plaintiffs and Appellants, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent.

STANTON WEITZEIL et al., Plaintiffs and Appellants, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent.

ROBERT GOIST et al., Plaintiffs and Appellants, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent.

**COUNSEL**

Laurence D. Steinsapir, Henry M. Willis, Schwartz, Steinsapir, Dohrmann, Sommers & Edelstein, Schwartz, Steinsapir, Dohrmann & Sommers and Schwartz, Steinsapir, Dohrmann, Krepack, Sommers & Edelstein for Plaintiffs and Appellants.

Jordan Rossen, Stephen P. Berzon and George C. Harris as Amici Curiae on behalf of Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman and Elizabeth Hong, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**GRODIN, J.**—Charles Evans, Stanton Weitzeil, Robert Goist and the United Steelworkers of America, AFL-CIO-CLC (petitioners) appeal from

judgments denying consolidated petitions for writ of mandate and dismissing the petitions as to the union without leave to amend for failure to state a cause of action.

Pursuant to a collective bargaining pension agreement, upon their retirement from Kaiser Steel Corporation (Kaiser) each of the three individual petitioners received a special payment which resulted in a reduction of their unemployment benefits under Unemployment Insurance Code section 1255.3. Petitioners' primary contention is that the special payment did not constitute a "pension, retirement or retired pay, annuity, or any other similar periodic payment . . . based on [their] previous work" as specified in section 1255.3[1] and therefore their unemployment insurance benefits were improperly reduced. Petitioners also challenge the amount of the special payment used to calculate the reduction in their unemployment insurance benefits and the manner in which the special payment was allocated. Finally, petitioners urge that the trial court erred in dismissing the petitions as to the union and contend they are entitled to attorney fees pursuant to Government Code section 800.

## I. SUMMARY OF FACTS AND PROCEEDINGS

Charles Evans retired from Kaiser effective August 9, 1980, and shortly thereafter applied for unemployment insurance benefits. His regular pension payments were scheduled to begin in December of 1980.

In October 1980, Evans received a lump sum special payment of $7,301.65 pursuant to the pension agreement. Under the terms of the agreement the special payment was allocable to the three-month period following

---

[1] All statutory references are to the Unemployment Insurance Code unless otherwise specified.

During the relevant period, Unemployment Insurance Code section 1255.3 provided in pertinent part: "(a) Except as provided by subdivision (c), the amount of unemployment compensation benefits, extended duration benefits, and federal-state extended benefits payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced, but not below zero, by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to such week.

" . . . . . . . . . . . . . . . . . . . . .

"(c) The reduction of benefits specified in subdivision (a) shall be limited by the provisions of any amendment to paragraph (15) of Section 3304(a) of the Federal Unemployment Tax Act, enacted before January 1, 1981, which mandates or permits a limitation on the reduction of unemployment compensation benefits by the amount of a pension, retirement or retired pay to an individual, as described in subdivision (a). This subdivision shall only apply to benefits paid after the effective date of the amendment to paragraph (15) of Section 3304(a) of the Federal Unemployment Tax Act."

the effective date of Evans's retirement. Consequently, the Employment Development Department (Department) found Evans ineligible for benefits pursuant to section 1255.3. Evans appealed the determination of the Department and in December 1980 a hearing was held before an administrative law judge (ALJ). The ALJ affirmed the determination. Evans thereafter filed an appeal with the California Unemployment Insurance Appeals Board (Board). The Board issued a decision affirming the decision of the ALJ.

Stanton Weitzeil was laid off by Kaiser effective March 15, 1980, for a definite 90-day period. His unemployment insurance benefit year began March 16, 1980, and benefits were paid for the weeks ending with March 29 through May 24, 1980. From April 27 until July 26, 1980, Weitzeil was on extended vacation and following that period he was on an "off work order" until August 25, 1980. Two days later Weitzeil elected to retire from the company and shortly thereafter he again applied for unemployment benefits. His claim was reopened effective September 28, 1980, and he was paid for the weeks ending October 4 through November 29, 1980. However, upon reopening Weitzeil's claim, the Department learned that sometime between September and November Weitzeil had received a lump sum payment of $4,015.35 as his special payment under the pension agreement. Upon receiving this information, the Department made a determination/ruling that the lump sum payment was allocable to the week following the last day worked and that therefore Weitzeil was ineligible for the week ending March 22, 1980. The decision was based on section 1255.3. Kaiser appealed from the determination/ruling; Weitzeil did not.

The ALJ's decision reversed the Department's determination/ruling that the lump sum pension was allocable to the week ending March 22, 1980, ruling instead that the lump sum was allocable to the months of September, October and November 1980. Consequently, Weitzeil was found ineligible for unemployment insurance benefits under section 1255.3 for that period. Weitzeil thereafter appealed to the Board from the ALJ's decision. The Board affirmed.

Robert Goist was laid off from work by Kaiser in May 1980 and was given the choice of either retiring or taking another position. Goist elected to retire and applied for his pension in July 1980. His regular pension benefits were to begin in November of that year. Sometime between the months of August and October 1980, Goist received a lump sum special payment in the amount of $4,098. In November Goist filed a claim for unemployment insurance benefits. However, as a result of the aforementioned special payment, he was found ineligible for unemployment benefits under section 1255.3. Goist appealed from the Department's determination of ineligibility. The ALJ issued a decision affirming the Department's determination.

Goist then appealed to the Board, which ultimately affirmed the decision of the ALJ.

Evans, Weitzeil and Goist each filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5. The United Steelworkers joined as copetitioners in each case. The three cases were subsequently consolidated. Following the submission of written and oral arguments, the court entered judgment in each case denying the petition for writ of mandate and dismissing the petition as to the union without leave to amend.[2] These appeals followed.

## II. Standard of Review

■ " 'In reviewing a decision of the [Unemployment Insurance Appeals] Board, the superior court exercises its independent judgment on the evidentiary record of the administrative proceedings and inquires whether the findings of the administrative agency are supported by the weight of the evidence.' [Citation.] ■ 'In reviewing the trial court's ruling on a writ of mandate, the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence.' [Citation.]" (*Sanchez* v. *Unemployment Ins. Appeals Bd.* (1984) 36 Cal.3d 575, 585 [205 Cal.Rptr. 501, 685 P.2d 61].)

This limitation, however, does not apply to resolution of questions of law where the facts are undisputed. In such cases, as in other instances involving matters of law, the appellate court is not bound by the trial court's decision, but may make its own determination. (See, e.g., *San Diego T. & S. Bank* v. *San Diego* (1940) 16 Cal.2d 142, 153 [105 P.2d 94, 133 A.L.R. 416]; *Jongepier* v. *Lopez* (1983) 142 Cal.App.3d 535, 538 [191 Cal.Rptr. 131].) ■ Statutory construction is such a question of law for the courts and the Board's administrative interpretations of statutes must be rejected where they are contrary to statutory intent. (*Pacific Legal Foundation* v. *Unem-*

---

[2]The court made the following findings in each case: "STATEMENT OF DECISION . . . [¶] 3. The weight of the evidence supports the conclusion that the lump sum is a pension payment which is subject to the provisions of Unemployment Insurance Code section 1255.3 and is not severance or vacation pay which is subject to Unemployment Insurance Code sections 1265 or 1265.5. [¶] 4. Severance pay has been given a specific meaning . . . in the Basic Agreement covering employment. The term 'vacation' as it is used in the pension agreement is only for the purpose of guaging [*sic*] the amount payable as a lump sum special payment. It is a 'rule of thumb.' [¶] 5. The weight of the evidence supports the manner in which [the Board] offset [the] lump sum pension payment against . . . unemployment insurance benefits. [¶] 6. Petitioner United Steelworkers of America, AFL-CIO-CLC has not and cannot state that its rights have been invaded or violated by [the Board's] decision. Therefore, petitioner union fails to state a cause of action."

*ployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 111 [172 Cal.Rptr. 194, 624 P.2d 244].)

In this case, the decisions of the Board and of the trial court were based upon their interpretations of section 1255.3. Thus it is appropriate that this court independently undertake the task of interpreting that statute.

## III. STATUTORY HISTORY

Prior to 1979, California's Unemployment Insurance Code had no pension offset provision. Section 1255.3 was added in 1979 in response to 1976 federal legislation which required the states to enact such provisions.

This federal legislation (26 U.S.C. § 3304(a)(15)) amending the Federal Unemployment Tax Act, originated in the Senate Committee on Finance. The Finance Committee expressed the intent of the new amendment in its report: "It was brought to the attention of the committee that in a number of States[1] retired people who are receiving public and private pensions, railroad retirement annuities, social security retirement benefits, military retirement pay, etc. and who have actually withdrawn from the labor force are being paid unemployment compensation. In other States, various rules are used to disqualify some or all of these people. The committee believes that a uniform rule is required and has added to the bill a new provision requiring each State to prohibit the payment of unemployment compensation to any individual who is entitled or [sic] any governmental or private retirement pay, retirement pension to [sic] retirement annuity based on previous employment. [¶] Because this provision requires a change in State law, it would not become effective until January 1978." (Sen. Rep. No. 94-1265, 2d Sess., pp. 21-22 (1976), reprinted at 1976 U.S. Code Cong. & Admin. News, pp. 6015-6016.)

The House Conference Committee succeeded in delaying implementation of the pension offset provision until 1979,[3] to allow the National Commission on Unemployment Compensation (Commission) to report on the issue. (See House Conf. Rep. No. 94-1745, 2d Sess., p. 16 (1976), reprinted at 1976 U.S. Code Cong. & Admin. News, p. 6040.)

The Commission ultimately submitted two reports which commented on the pension offset. In these reports, the Commission stated that the pension

---

"[1]As of January 1976, the States were Alaska, Arizona, California, Georgia, Kansas, Kentucky, Nevada, New Jersey, North Carolina, North Dakota, Puerto Rico, Rhode Island, South Carolina, Texas, and Vermont."

[3]Subsequently, the effective date of 26 United States Code section 3304(a)(15) was further delayed until 1980.

offset provision was both unfair and misguided. In the Commission's view, this was a matter best left to the several states in their administration of unemployment compensation. The Commission condemned the amendment for introducing an inappropriate "needs test" into unemployment compensation, an approach fundamentally incompatible with the social insurance philosophy underlying the basic program. In addition, the Commission noted that, in the present economy, many workers are pushed into early retirement by industry-wide layoffs and that, while these workers may qualify for an early retirement pension, they are also still in the labor force, actively seeking new employment. What is more, a pension offset unfairly discriminates against workers wholly dependent upon income from pensions and unemployment compensation, while workers with other sources of income, from rental property, for example, or investments, are not penalized.

Finally, the Commission observed that the pension offset provision as enacted was ill-suited to solving the problem of double payments by a single employer to the same retiree. In many cases the base-period employer, who bears a portion of the cost of unemployment compensation, is not the same employer who contributed to the retiree's pension. In short, the Commission concluded the pension offset provision was essentially ill-conceived and urged its immediate repeal. (See First Interim Rep., National Com. on Unemp. Comp., Nov. 1978; Unemp. Comp.: Final Rep., National Com. on Unemp. Comp., July 1980.)

It is apparent that the California Legislature shared the Commission's view. In 1979, the Legislature enacted section 1255.3 which duplicated the language of the federal law, but added the following "self-destruct" clause: "(b) The provisions of this section shall be operative only during such time as Section 3304 of the Federal Unemployment Tax Act requires that state unemployment insurance laws contain such provisions as a condition of certification of state unemployment insurance laws by the Secretary of Labor." (Stats. 1979, ch. 754, § 1, p. 2612.)

Subsequently, in 1980, at a time when Congress was considering an amendment to limit the pension offset in a variety of ways, the Legislature added subdivision (c) to section 1255.3,[4] evidently to assure that the California statute would, at no time, provide for a greater offset than required by federal law. Indeed, the 1980 amendment was enacted as an urgency measure, effective immediately, in part "to insure that unemployment insurance claimants are not penalized unfairly for the receipt of payments they have funded." (Stats. 1980, ch. 1174, § 3, p. 3945.) This history in-

---

[4]See footnote 1, *ante,* page 405.

dicates that the intent of the Legislature, in enacting section 1255.3, was to provide for compliance with the letter of the federal law, and nothing more.

■ At the same time, California policy regarding the treatment of vacation pay earned but not paid prior to termination of employment is equally clear. Section 1265.5, enacted in 1971, provides: "Notwithstanding any other provision of this division, payments to an individual for vacation pay which was earned but not paid for services performed prior to termination of employment, or commencement of unemployment caused by disability, as the case may be, shall not be construed to be wages or compensation for personal services under this division and benefits payable under this division shall not be denied or reduced because of the receipt of such payments."

Prior to the enactment of section 1265.5, payment of unemployment compensation was postponed until such accrued vacation pay had been used. (See *Los Angeles Turf Club, Inc.* v. *Unemployment Ins. Appeals Bd.* (1981) 117 Cal.App.3d 454, 459 [172 Cal.Rptr. 803].) As noted in *Los Angeles Turf Club,* section 1265.5 was enacted in response to the prevailing judicial treatment of vacation pay as allocable to the period in which it was realized. Thus, section 1265.5 "represents a legislative decision that . . . it is desirable in matters of unemployment insurance that all payments earned by employees be allocated to the period during which they were earned rather than the period in which they can be realized." (*Ibid.*) Section 1265.5 clearly establishes a policy that unemployment compensation should not be offset by accrued vacation pay received after termination of employment.

In light of the legislative policy that accrued vacation pay should not offset unemployment compensation, we must consider the Board's treatment of the special payment under section 1255.3 to determine whether the Legislature's objectives are served by the Board's approach.

## IV. CHARACTERIZATION OF THE "SPECIAL PAYMENT"

The special payment is described as follows in the pension agreement.

"The Special Payment is the payment for the first three full calendar months following the month in which retirement occurs, but it does not apply in the case of a permanent incapacity retirement or a deferred vested pension. It is a lump sum equal to 13 weeks of vacation pay, reduced by any regular vacation pay received for the year of retirement or for an earlier year if the participant is not entitled to vacation in the year of retirement. Under the basic labor agreement a participant entitled to vacation which he has not taken by the time of retirement does not receive that vacation or vacation pay if he is eligible for the Special Payment, but no deduction will

be made from the Special Payment for such vacation. Any pensioner who is reemployed shall not, upon subsequent retirement, be eligible for a Special Payment if he received a Special Payment upon his initial retirement.

"For each month to which the Special Payment does not apply, the pension is the Regular Pension.

"For the purpose of determining the Special Payment, vacation pay shall be adjusted to exclude the Cost-of-Living Adjustment included in the base hourly or salary rates other than the first Cost-of-Living Adjustment included in the base hourly or salary rates subsequent to April 30, 1974, except that such vacation pay adjustment shall not apply to vacation pay for any weeks of regular vacation to which the participant was or would have been entitled in the year of retirement or for an earlier year if the participant is not entitled to vacation in the year of retirement."

The amount of the special payment is calculated according to a formula which distinguishes between workers who retire with accrued vacation time and those who retire with none. Specifically, the pension agreement provides for calculation of the amount of the special payment as follows:

"Special Payment

"3.2 (a) The amount of special payment for a participant who was entitled to receive a vacation in the year of retirement or who would have been entitled to receive a vacation in the year of retirement except for such retirement shall be calculated as follows:

"(1) The number of weeks of vacation to which the participant was or would have been entitled will be determined.

"(2) The number determined in (1) above shall be subtracted from 13.

"(3) The number determined in (1) above shall be multiplied by the participant's vacation pay.

"(4) The result determined in (2) above shall be multiplied by the participant's adjusted vacation pay.

"(5) The amounts calculated in (3) and (4) above shall be added together and then reduced by all vacation pay the participant received in such year.

"(b) The amount of special payment for a participant not in any event entitled to vacation in the year of retirement shall be calculated under the

formula established in (a) above as though the participant had retired in the year in which he was last entitled to a vacation.

"(c) The special payment shall be payable for the first three full calendar months following the month in which retirement occurs. Such special payment shall be made in a lump sum within the first full calendar month following the month in which retirement occurs or within the month following the month in which application for pension is made, whichever is later.

"· · · · · · · · · · · · · · · · · · ·

"(e) As used in this Agreement the word 'vacation' means the vacation provided under the vacation section of the Basic Agreement, 'vacation pay' means the pay for a week of vacation calculated as provided in the vacation section of the Basic Agreement and 'adjusted vacation pay' means the vacation pay reduced by the amount of such pay which results from a Cost-of-Living Adjustment other than the first Cost-of-Living Adjustment included in the base hourly or salary rates subsequent to April 30, 1974."

Thus all retiring employees, other than those who retire on disability or who qualify for a "deferred vested pension,"[5] receive the special payment. However, for some retiring employees, the special payment consists, in large part, of accrued vacation pay. For others, those who are ineligible for vacation or who have used all available vacation time prior to retirement, the special payment appears to be a sort of retirement bonus, calculated with reference to the rate of vacation pay, but otherwise unrelated to the employee's actual eligibility for vacation.

For example, employees are generally entitled to 13 weeks of "adjusted vacation pay" as the special payment. But an employee who was entitled to five weeks of vacation in the year of retirement but had taken none would receive this five weeks of vacation pay plus only eight weeks of "adjusted vacation pay" as special payment. Had the same employee actually *taken*

---

[5] Under the pension agreement, all employees with at least 10 years continuous service are eligible for a pension, but there is also an age prerequisite for immediate eligibility. Employees who retire prior to age 50 are eligible only for a "deferred vested pension," payable after they attain age 60. A special payment is not made in the case of a "deferred vested pension."

five weeks of vacation in the retirement year, the special payment would consist only of the eight weeks of "adjusted vacation pay."[6]

Whether the special payment does or does not include accrued vacation pay in any individual employee's case, it is always paid out of the pension trust fund. And, in all cases, payment of the regular pension is delayed for three full calendar months after retirement.

 Based on the mechanics of its calculation, petitioners argue that the special payment is really vested vacation pay under another label. But, as to an employee with no accrued vacation at the time of retirement, this is obviously inaccurate. The special payment is calculated by reference to a pay rate labelled "adjusted vacation pay," but there is no further similarity between the special payment and actual vacation pay.

Under the terms of the pension agreement, the special payment is payable to all employees eligible for an immediate pension regardless of their vacation eligibility status. Even employees with no accrued, unpaid vacation time are eligible to receive it. As to these workers, the special payment consists essentially of 13 weeks of pay allocable to the first 13 weeks of retirement. The payment is described as a "type of pension payment" in the pension agreement,[7] and it is paid out of the pension fund. Thus the

---

[6]Subparagraph (b) of paragraph 3.2 of the pension agreement is confusing. It provides that, for employees not entitled to vacation in the year of retirement, the special payment shall be calculated as though the individual had retired in the year in which he was last entitled to vacation. While this might at first suggest that employees who retire with no accrued vacation time will, under certain circumstances, be paid for accrued vacation, this does not appear to be the case.

Most employees with accrued but unused vacation are entitled to carry their accumulated vacation forward from one year to the next. The record in this case does not provide sufficient information to say with certainty, but we presume Kaiser employees are entitled to carry unused vacation time forward in this manner. If so, then an employee who is "not . . . entitled to vacation in the year of retirement" has either never been eligible for vacation, or has used all accumulated vacation time prior to the retirement year.

In the former case, the special payment calculation would provide, as usual, for a payment of 13 weeks of "adjusted vacation pay." In the latter instance, the calculation refers us to the "year in which he was last entitled to a vacation," which we interpret to mean the year in which the last of this employee's accumulated vacation was actually taken.

Treating that year as the retirement year for the purpose of calculating the special payment results in *subtracting* the number of weeks of vacation taken during that year from the special payment. Thus, as we read subparagraph (b), it can only serve to *reduce* the special payment from the 13-week amount payable to an employee with no vacation entitlement. In no case would an employee "not entitled to vacation in the year of retirement" receive anything more than a maximum of 13 weeks of "adjusted vacation pay."

[7]We do not suggest that the characterization given to a payment in a collective bargaining agreement is dispositive for purposes of the administration of the unemployment compensation laws. (See *Los Angeles Turf Club, supra,* 117 Cal.App.3d 454, 460-461.) Nonetheless, it is appropriate, in reaching our determination whether or not this special payment should be considered a pension for section 1255.3 purposes, to take notice of the fact that both parties to the collectively bargained pension agreement agreed to characterize it as a "pension payment" in that agreement.

special payment is labelled a pension payment, is paid out of the pension fund, and is paid upon retirement to all eligible employees regardless of vacation status. In short, as to retiring workers with no accrued vacation the entire special payment appears to be a type of pension, retirement pay or "other similar periodic payment . . . based on . . . previous work," within the terms of section 1255.3 and the federal statute.

Petitioners' argument is more persuasive, however, as regards workers who actually retire with accrued vacation time. For such workers, as noted above, a sizeable portion of the special payment actually consists of "vacation pay which was earned but not paid for services performed prior to termination of employment" within the terms of section 1265.5.

■ Generally, the right to vacation pay is nonforfeitable and such pay will be paid to the employee on the termination of his employment for any reason, on his retirement, or on his death to his heirs or estate. (28 Ops.Cal.Atty.Gen. 40, 42 (1956).) Indeed, Labor Code section 227.3 provides that, upon termination, vested vacation time shall be paid as wages and "that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination." And this court has determined that the right to paid vacation "vests" as the employee's labor is rendered. (*Suastez* v. *Plastic Dress-Up Co.* (1982) 31 Cal.3d 774, 780-781 [183 Cal.Rptr. 846, 647 P.2d 122, 33 A.L.R.4th 254].) Kaiser workers who leave after at least 10 years continuous service but prior to age 50 (and who are not therefore entitled to receive the special payment upon retirement) may take their accrued vacation pay after the termination of their employment and—if they are otherwise eligible for unemployment compensation—can suffer no offset under the terms of section 1265.5. By contrast, those older workers eligible for the special payment are required, under the terms of the pension agreement, effectively to *forfeit* their accrued vacation pay in order to receive a precisely equivalent amount from the pension fund.[8] It is important to note that, with reference to this accrued vacation pay, these older employees receive nothing *more* than their younger co-workers upon retirement. Rather, they receive the same amount of accrued vacation pay they would have received if they were ineligible for a pension. In effect, the 13-week special payment *pension* they would otherwise have received (i.e., if they had retired with no vacation eligibility) is *offset*, week-for-week, to account for their accrued vacation pay.

■ Under these circumstances, we consider it contrary to the statutorily expressed policy of the California Legislature to treat the accrued va-

---

[8]The record suggests that the pension plan is financed entirely by employer contributions. Thus, it appears that instead of paying accrued vacation pay directly out of the payroll, the employer pays the same amount out of the pension fund.

cation pay component of the special payment as a pension for purposes of the offset mandated in section 1255.3. Nor do we consider the Board's approach to be required by federal law. The federal enactment was clearly intended to apply to those receiving *retirement pay.* As noted above, accrued vacation is ordinarily payable upon termination whether the departing employee quits, is fired, retires or dies. Accrued vacation pay cannot therefore appropriately be viewed as retirement pay. Thus, a strict construction of the federal statute suggests that the offset need not apply to accrued vacation pay even when, as in this case, a collective bargaining agreement characterizes such pay as part of the employee's "pension payment."

■ Petitioners argue, alternatively, that the entire special payment should be considered severance pay and therefore exempt from offset under the provisions of section 1265. We do not find this theory persuasive.

Section 1265 provides, in pertinent part: "Notwithstanding any other provisions of this division, payments to an individual under a plan or system established by an employer who makes provisions for his employees generally, or for a class or group of his employees, for the purpose of supplementing unemployment compensation benefits shall not be construed to be wages or compensation for personal services under this division and benefits payable under this division shall not be denied or reduced because of the receipt of payments under such arrangements or plans." This section has been interpreted to encompass the payment of "severance pay" or "dismissal pay" paid pursuant to a collective bargaining agreement. (*Powell* v. *California Dept. of Employment* (1965) 63 Cal.2d 103 [45 Cal.Rptr. 136, 403 P.2d 392]; *Citroen Cars Corp.* v. *Unemployment Ins. Appeals Bd.* (1980) 107 Cal.App.3d 945 [165 Cal.Rptr. 924].)

But the special payment described in this pension agreement is not "for the purpose of supplementing unemployment compensation benefits," nor is it designed to compensate workers who are involuntarily unemployed. On the contrary, the special payment is payable *only* to those workers who qualify to receive an immediate pension. Laid-off Kaiser workers who are ineligible for a pension or who qualify only for a "deferred payment pension" do not receive the special payment at all. By the same token, *all* Kaiser workers who qualify for payment of an immediate pension are entitled to receive the special payment regardless of the circumstances of their termination (i.e., whether they are laid off or retire voluntarily). Thus, the special payment does not appear to fall within the scope of compensatory payments envisioned by section 1265.

■ Finally, petitioners argue that the special payment cannot be considered a "pension" under the terms of 26 United States Code section

3304(a)(15) and section 1255.3 because, in certain respects, the terms of the pension agreement pertinent to the special payment violate substantive provisions of the Employment Retirement Income Security Act of 1974 (ERISA). One of petitioners' arguments on this issue is rendered moot by our determination that that part of the special payment equivalent to accrued vacation pay should not be considered pension pay under the terms of section 1255.3.

Another of petitioners' arguments is that, because the pension agreement specifies that the special payment can be paid only once in each worker's lifetime even if the employee resumes his employment with Kaiser and leaves again, receipt of the special payment is equivalent to a forefeiture of benefits forbidden under ERISA provisions. We question the logic of the assertion that *payment* of benefits is equivalent to *forfeiture* of benefits.

In any case, we find petitioners' underlying premise—that the special payment cannot be considered retirement pay if the terms governing its administration do not comply with ERISA provisions—unpersuasive. Neither the federal pension offset provision nor its state equivalent makes any reference to ERISA coverage or requirements. Thus, there is no indication that Congress or the Legislature intended that the issue whether or not employee benefit payments should be considered retirement pay for the purpose of reducing unemployment insurance benefits should be resolved on the basis of whether or not such payment plans complied with ERISA requirements. In our view, this issue is simply irrelevant to resolution of the question before us.

■ We conclude that that portion of the special payment which is not equivalent to accrued vacation pay is properly considered a pension payment for purposes of reducing unemployment benefits under section 1255.3. That part of the special payment equivalent to accrued vacation pay, however, must be exempted from the statutory offset provision.

### V. AMOUNT OF OFFSET: PENSION BENEFITS EARNED DURING BASE PERIOD

In 1980 Congress amended 26 United States Code section 3304(a)(15), to read in pertinent part: "(A) *the [pension offset] requirements of this paragraph shall apply to any pension . . . only if—* [¶] (i) such pension . . . or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law), and [¶] (ii) in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974 . . ., *services performed for such employer by the individual after the beginning of the base*

*period (or remuneration for such services) affect eligibility for, or increase the amount of, such pension, . . . or similar payment, and* [¶] (B) the State law may provide for limitations on the amount of any such a reduction to take into account contributions made by the individual for the pension, . . . or other similar periodic payment . . . ." (Italics added.)

 Petitioners interpret the amended federal statute as limiting the amount that may be offset against unemployment insurance benefits to the increase in pension benefits earned (i.e., the amount of pension benefits accrued) during the base period. We do not agree.

The amended federal statute does not purport to limit the amount of offset to the increase in pension benefits earned during the base period. Rather, it mandates that no offset is to be made at all unless two conditions are met: (1) only if the pension or payment to be offset is under a plan maintained or contributed to by a base period employer or the chargeable employer and (2) only if the services performed for that employer by the individual after the beginning of the base period affected his or her eligibility for or increased the amount of the pension or payment to be offset.

Prior to the 1980 amendment, states were required to offset an unemployment insurance claimant's pension against current benefits even though those benefits were being drawn against the unemployment insurance account of an employer who did not contribute to the employee's pension. It was primarily that inequity which Congress sought to remedy by the 1980 amendment.

There is no evidence to suggest that the purpose of subparagraph (A)(ii) was to limit the amount of pension subject to the offset to the increase in pension benefits earned during the base period. The federal courts have recently confronted this very issue and concluded that the entire pension, not just the incremental increase, is to be offset against unemployment insurance benefits. (*Rivera* v. *Becerra* (9th Cir. 1983) 714 F.2d 887, 893-894, affirming on this point *Rivera* v. *Patino* (N.D.Cal. 1982) 543 F.Supp. 1160, 1167-1172.)

As to that portion of the special payment which is not equivalent to accrued vacation pay, therefore, the Board correctly reduced unemployment insurance by the entire amount of special payment received.

## VI. ALLOCATION OF THE SPECIAL PAYMENT

In each of the three cases at issue here, the Board allocated the petitioner's special payment to the entire three-month period following retirement. In

each case, this resulted in ineligibility for unemployment benefits for the entire three-month period. Petitioners take issue with this method of allocation.

As noted above, section 1255.3 provides that "for any week," unemployment benefits shall be reduced by an amount equal to the amount of any periodic retirement pay "reasonably attributable to such week." The Board's allocation of the special payment was based primarily upon the terms of the pension agreement, which provides in pertinent part: "The special payment shall be payable for the first three full calendar months following the month in which retirement occurs."

Petitioners argue that if the special payment is a pension at all it must be considered a pension payable in a lump sum and subject to special allocation procedures under the terms of the California Employment Development Department's (EDD) own rules. In part, petitioners' argument on this issue is rendered moot by the stipulated judgment entered in *Rivera* v. *Becerra* (N.D.Cal. 1982) No. C-80-3469, a class action against the director of EDD and the Secretary of the United States Department of Labor brought on behalf of all California residents whose unemployment benefits had been reduced or eliminated because of section 1255.3.

Prior to entry of the judgment in *Rivera,* the policy of the EDD had been to allocate pensions payable in a lump sum to the week in which they were paid and to offset unemployment benefits only for that one week. Thus, regardless of the amount of the lump sum pension—the EDD's own directive used the example of a $50,000 pension—the retiree would lose only a single week's unemployment compensation. Petitioners sought to require the Board to follow the EDD policy in these cases and offset unemployment benefits only for one week rather than three months.

The parties to the judgment in *Rivera* v. *Becerra,* however, stipulated that "26 U.S.C. § 3304(a)(15), as amended, the federal pension offset provision, and California Unemployment Insurance Code § 1255.3 do not require the offset against unemployment insurance of a pension paid to a claimant on a lump sum basis. Defendant Director of the California Development Department agrees not to offset against unemployment insurance any pension that is paid to a claimant on a lump sum basis. Defendant Director of the California Employment Development Department further agrees to restore to plaintiff class members any unemployment insurance benefits that would have been paid but for the offset of a pension that was paid to a claimant on a lump sum basis."

The stipulation does not so state, but presumably the reason the EDD and the Secretary of Labor agreed to this outcome is that the exact words of 26

United States Code section 3304(a)(15), "pension, retirement or retired pay, annuity or any *other* similar *periodic* payment" (italics added), cannot reasonably be construed to include pensions entirely paid in a single installment. In any case, in light of the disposition in *Rivera,* it is clear that if petitioners' argument that the special payment is a "lump sum pension" is persuasive, then the EDD is already bound to restore to petitioners all unemployment benefits withheld to offset the special payment.

Thus we need not address petitioners' argument that the Board is required to follow departmental policy as set out in EDD directives. In light of the stipulation entered in *Rivera,* this issue is irrelevant. ▮▮▮ Rather, we must determine whether the special payment is a "pension that is paid to a claimant on a lump sum basis" as that term is used in *Rivera.*[9] We conclude that it is not.

Both under the terms of the pension agreement and in actuality, the special payment and the "regular pension" are components of a single integrated periodic pension plan. In effect, the special payment is the first installment of a pension whose regular monthly installments begin three months after retirement. The fact that the first interim payment is paid on a quarterly basis and is calculated differently does not suggest that it is a "pension paid on a lump sum basis" independent of a periodic pension which commences in the second quarter after retirement.

Further, a legislative distinction between pensions entirely paid in a single lump sum and pensions paid in "periodic payments" is rational, primarily because of the administrative and equitable difficulties inherent in attempting to prorate a lump sum pension over the remainder of a retiree's life for purposes of calculating a weekly unemployment benefit reduction. No such rationale justifies a distinction between this special payment and other periodic retirement payments. The special payment is allocated by the terms of the agreement to a specified, finite period. Indeed, in that it typically provides 13 weeks of pay for a 13-week period, the agreement itself provides an equitable formula for the allocation of the special payment.

---

[9] The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), in an amicus curiae brief, argues that the judgment in *Rivera* v. *Becerra* is res judicata in this case. The argument is essentially that *Rivera* v. *Becerra* determined that the pension offset provision does not apply to pensions paid on a lump sum basis and, since this special payment is a pension paid on a lump sum basis, the judgment in *Rivera* is determinative. In a reply brief, the Board informs us that, since the entry of judgment in *Rivera,* EDD practice has been to exempt only pensions *entirely* paid in a single lump sum from offset. The special payment at issue in this case remains subject to offset under current departmental policy. The issue remaining to be decided in this case, as noted above, is whether the special payment is or is not a pension paid on a lump sum basis. If the UAW contends that the EDD is not in compliance with the judgment of the federal court that is a matter which should be taken up in federal court, rather than in this appeal.

■ However, this formula itself leads us to conclude that the Board's current method of allocating the special payment is erroneous, at least as to some recipients. As noted above, a major part of some retirees' special payment consists of accrued vacation pay within the terms of section 1265.5. This section, by its own terms, prohibits denial or reduction of unemployment compensation because of the receipt of such accrued vacation pay.

Thus, many retirees qualify for a special payment consisting of several weeks of accrued vacation pay, as to which unemployment compensation offset is statutorily prohibited, and several weeks of "adjusted vacation pay" as to which such offset is statutorily required. The only rational method of harmonizing sections 1255.3 and 1265.5 in this peculiar context is to allocate the special payment in weekly increments consistent with the method of calculation. If an employee qualifies for a special payment consisting of five weeks of accrued vacation pay and eight weeks of "adjusted vacation pay," the Board may reduce only eight weeks of unemployment benefits to offset receipt of retirement pay.

■ Petitioner Goist, however, had taken five weeks of vacation in his retirement year prior to retirement. Under the terms of the pension agreement, therefore, his earned vacation pay was deducted from his calculated special payment. Thus, rather than five weeks of accrued vacation pay and eight weeks of "adjusted vacation pay," Goist received *only* eight weeks of "adjusted vacation pay." Nonetheless, the Board prorated Goist's eight weeks of pay across the entire three-month period prior to the commencement of Goist's regular pension payments and found Goist ineligible for unemployment compensation throughout that entire period.

We conclude that this manner of apportionment does not meet the standard of reasonableness mandated by section 1255.3. If eight weeks of pay can only reduce eight weeks of unemployment in the case of a worker who retires with accrued vacation time, it is unreasonable that the same eight weeks of pay should reduce thirteen weeks of unemployment compensation in the case of a worker who retires with none.

Rather, the calculation of the special payment itself should be employed to supply the reasonable attribution of the special payment. The special payment is calculated on a 13-week basis. Each week's payment should be attributed to a week of potential eligibility for unemployment compensation. The Board may reduce unemployment compensation only for those weeks in which "adjusted vacation pay" is paid. Eight weeks of adjusted vacation pay will result in eight weeks of offset. Offset may not be applied to weeks

for which the employee either receives accrued vacation pay or receives nothing.

## VII. Petitioners' Claim to Attorney Fees

Petitioners seek an award of attorney fees under Government Code section 800 upon remand. Section 800 provides for the recovery of attorney fees incurred in a civil action challenging the determination of an administrative agency where the challenging party has prevailed and it is shown that the action of the administrative agency was arbitrary or capricious. Here, although petitioners have prevailed, we conclude that no award of fees under section 800 is warranted.

Such an award must be based upon a finding that the public entity engaged in "conduct not supported by a fair or substantial reason" or "unsubstantiated determinations." (*Seghesio* v. *County of Napa* (1982) 135 Cal.App.3d 371, 377 [185 Cal.Rptr. 224].) Here, while we disagree with the Board's interpretation of section 1255.3, the record reflects that the Board's interpretation of the statute was not unreasonable nor were its actions arbitrary or capricious. Under such circumstances, no award under Government Code section 800 is warranted. (See, e.g., *Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 417-418 [151 Cal.Rptr. 866].)

In light of our determination that the relief sought by the individual petitioners should, in part, be granted and the fact that the United Steelworkers sought no other relief, it is unnecessary to consider the claim that the trial court erred in dismissing the union as copetitioner in the actions below.

The judgments are reversed and the causes remanded to the superior court with directions that the superior court remand the matters to the Board for further proceedings consistent with the views expressed herein.

Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.