[L.A. No. 31809. Aug. 23, 1984.]

ERADONNA SANCHEZ et al., Plaintiffs and Appellants, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent;
TRIBAL AMERICAN CONSULTING CORPORATION,
Real Party in Interest and Respondent.

## COUNSEL

Rees Lloyd for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman and Richard J. Magasin, Deputy Attorneys General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

## OPINION

**GRODIN, J.**—Is an employee rendered ineligible for unemployment benefits if, in the face of continuing harassment and threatened dismissal in retaliation for her union activities and "whistle blowing" to public authorities, she quits her job rather than wait to be fired? We hold that an employee who quits under such circumstances has "good cause" for doing so within the meaning of Unemployment Insurance Code section 1256,[1] and thus does not lose her eligibility on that account.

In this case, the Unemployment Insurance Appeals Board (board) found that claimants Eradonna Sanchez and Pattie Douglas left their employment with Tribal American Consulting Corporation (TACC) voluntarily and without good cause, and thus were ineligible for unemployment benefits. Claimants petitioned the superior court for a writ of mandamus (Code Civ. Proc., § 1094.5) to compel the board to vacate its ruling, but their petition was denied, and they appeal from the ensuing judgment. We hold that the circumstances under which the claimants left their employment with TACC constituted good cause for doing so, and that they are entitled to the relief requested.

---

[1] All statutory references are to the Unemployment Insurance Code unless otherwise specified.

## I.

TACC was a publicly funded, privately operated nonprofit corporation, created to promote the educational, economic and cultural advancement of the American Indian. It received substantial funds from the United States Department of Health, Education and Welfare, the United States Department of Labor, the California State Department of Education, and the County of Los Angeles. To accomplish its aims, TACC operated child development centers for infant-toddlers, preschool and primary age school children.

Eradonna Sanchez and Pattie Douglas were employed at one of these centers. Douglas had worked for six years as a master teacher in the preschool division. Sanchez had worked for approximately four years as coordinator for parent involvement in the same facility.

By the summer of 1979, TACC's governmental funding was in serious jeopardy. In June 1979, the Department of Labor terminated TACC's Comprehensive Employment and Training Act grant three months prior to its scheduled expiration date. This represented a loss of $1.5 million in annual revenue. Subsequent governmental investigations and audits throughout 1979 and 1980 eventually resulted in termination of all TACC's public funding because of mismanagement and misuse of public funds. In August 1981, a federal grand jury indicted four TACC administrators on charges of conspiracy and embezzlement of government funds. Sandy Gibbs, president of TACC, was one of the four.[2]

Douglas and Sanchez, along with numerous other TACC employees, were instrumental in bringing these abuses to light. Early in August 1979, both claimants participated in meetings with other TACC employees. As a result of these meetings, the employees drafted a letter and sent it to state and federal funding agencies. The letter detailed employee concerns about conditions at TACC which they felt threatened TACC's effectiveness in serving the community, including misuse of public funds, nepotism, favoritism, and sexual harassment. The letter was signed by five to eight TACC employees including Douglas.[3] This letter eventually resulted in a governmental investigation and audit.

Also as a result of these August meetings, TACC employees formed a labor organization, Tribal Educational Workers Association (TEWA). Eliz-

---

[2]Gibbs was ultimately convicted on 20 counts of embezzlement of federal funds. (*United States* v. *Gibbs* (9th Cir. 1983) 704 F.2d 464.)

[3]It is unclear whether Sanchez signed the letter, although she apparently participated in drafting it.

abeth Fragua-Lloyd, the director of curriculum at TACC, was elected president. Sanchez and Douglas became union members in August and served as co-vice presidents of the union. TEWA was later designated by TACC employees as their collective bargaining representative in an election conducted by the National Labor Relations Board (NLRB).

During the summer of 1979, both Douglas and union president Fragua-Lloyd were promoted. Douglas was given the position of curriculum specialist and began work in her new position on August 20, 1979. That same day, Gibbs called Douglas and Fragua-Lloyd into his office and informed them that they had been demoted. Gibbs told them that they were not qualified for their new positions. When asked why, Gibbs replied that they had participated in secret meetings and had contacted government agencies and were trying to destroy TACC.

A few days later, Gibbs met with the two women again, informed them that he had changed his mind, that they were qualified, and that he was going to reinstate them. When asked to put this reinstatement in writing, he adamantly refused. He then asserted that neither woman was "spiritually fit" for her new position and demoted them both again. Both women filed grievances with the TACC board of directors. These proved fruitless.

On August 24, 1979, 16 TACC employees, including Douglas and Sanchez, submitted to Gibbs a list of employee grievances filed pursuant to procedures in TACC's employee handbook. The listed grievances included a request for the names of the TACC board of directors, a request for copies of the annual budget and monthly updates, a request for a written employment contract, a request for a responsible grievance procedure and a grievance committee, and a request for improved employee health benefits. Gibbs never personally responded. Instead, a subordinate told the employees that TACC management would meet with them individually to discuss their grievances, but not as a group. The employees refused.

Early in September 1979, Kathryn Manness began working at TACC as a social worker. As such, she was part of the management structure of the organization and directly supervised Sanchez. Gibbs identified Douglas and Sanchez to Manness as "ringleaders and troublemakers of the union," and instructed her to keep a running report of all her interactions with Sanchez to provide documentation for her termination.

The NLRB-conducted union election was held on October 10. Sanchez participated as an official observer. The next day union leaders, including Fragua-Lloyd and Sanchez, held a meeting with a representative of the local press. They discussed TACC's employees' concerns with the organization's

future in light of continuing governmental investigations into misuse of funds. The resulting article, including a photograph of the employee participants, was published on October 12. On October 17, Fragua-Lloyd was fired for holding an unsanctioned press conference and for insubordination.[4] Fragua-Lloyd filed a complaint with the NLRB. Shortly thereafter, Douglas filed a complaint with the NLRB regarding her demotion in August.

On October 22, 1979, several TACC employees began a strike to protest Fragua-Lloyd's dismissal. Sanchez and Douglas participated in the strike, which lasted until November 1. They also participated in the negotiations which led to the strike's settlement. On November 1, TACC and TEWA entered into an interim agreement which provided, among other things, that TACC employees had the right to contact government funding agencies without fear of retaliation.

Beginning in October, TEWA contacted almost every major public agency funding TACC to suggest that the organization should be put into receivership. TEWA promoted this receivership scheme as an alternative to simple termination of TACC's funding, which TEWA thought likely, in an effort to preserve TACC employees' jobs. During the strike, Douglas and Sanchez met with representatives of the United States Department of Health, Education and Welfare to request an investigation of TACC and imposition of receivership. On October 26, Los Angeles County suspended its financial support of TACC pending an audit.

Shortly after Fragua-Lloyd's discharge, Gibbs met with Manness and told her he would fire Sanchez as soon as he "got anything on her." Throughout the fall, Gibbs held management meetings in which he discussed how to get rid of the union leaders, especially Sanchez. During the employees' strike, Gibbs articulated a plan to drag out inconclusive negotiations throughout the school year, terminate all employees at the end of the year, and refuse to hire back the union members in the fall. He specifically identified Sanchez and Douglas among the troublemakers whom he would not rehire.

In November, as a result of an ambiguous instruction from her supervisor, Sanchez submitted an untimely biannual report. Gibbs ordered Manness to issue Sanchez an official letter of reprimand. Feeling that the reprimand was undeserved, Manness refused. Manness thereafter wrote a memo to Gibbs outlining what had occurred and why the reprimand was inappropriate. Gibbs, angry at her refusal, told other employees that he was going to fire her because "union members had gotten to her." Manness was terminated on December 4, 1979. Manness filed a complaint with the NLRB.

---

[4]Fragua-Lloyd applied for, and collected, unemployment compensation.

Early in November, Gibbs instructed Jennifer Regina, his administrative assistant, to observe union members closely and to write them up if they did anything remotely violative of TACC policies. In late December or early January, Gibbs told Regina he wanted employee evaluations which would support the termination of all union members by June. He specifically mentioned Douglas and Sanchez. Gibbs told other TACC employees that it was only a matter of time until Douglas and Sanchez would be dismissed. The word eventually filtered down to both that they had been labelled "troublemakers" and that Gibbs wanted to dismiss them.

In the spring of 1980, employees at the preschool site where Sanchez and Douglas worked held a meeting to discuss problems they perceived with the program. These included an adult-child ratio seriously out of compliance with state guidelines,[5] a lack of classroom supplies, and the continuing problem of a school bus driver who was not properly certificated.[6] Douglas was designated as the employees' representative to contact TACC management about these problems and, if that failed, to contact state officials.

When management failed to respond to Douglas's concerns, she contacted the State Department of Education, Office of Child Development, early in March. On March 7, 1980, Douglas received an official letter of reprimand, denying that any problems existed and sanctioning her for needlessly contacting a government agency. In her six years of service at TACC, this was the first reprimand or complaint she had ever received. According to the TACC personnel manual, such a letter was the first step toward more severe disciplinary action.

Based upon their experiences and those of others during the period of August 1979 through March 1980, Douglas and Sanchez decided to resign. Accordingly, Douglas terminated her employment on March 28, 1980, and Sanchez on April 8, 1980.

Meantime, the NLRB hearing, based upon the complaints of Fragua-Lloyd, Douglas, and Manness, as well as a complaint filed by TEWA, was held on April 1, 2, and 3, 1980. Both Sanchez and Douglas testified at the hearing. TACC presented no testimony.

---

[5]The state Preschool Guidelines Manual specified a ratio of one adult to every five children. In January and February, the actual ratio at the preschool was often as low as one adult to nine children.

[6]The driver in question had been cited by the California Highway Patrol for failure to have the proper certificate. He had also evidently hit a child with the school bus at another facility. Parents were understandably upset and had complained to TACC employees, including Sanchez.

Douglas and Sanchez filed claims for unemployment compensation. Both were denied.[7] Both claimants filed timely appeals to a referee (§ 1328) and their cases were consolidated for hearing and decision in accordance with title 22, California Administrative Code section 5032. After an administrative hearing, the referee entered a written decision affirming the department's denial of benefits.

The referee found that both claimants "were sincerely motivated by the public interest in an effort to 'clean house' because of alleged abuses and irregularities which affected the public welfare." Nonetheless, he found that "[t]he claimants both voluntarily quit in anticipation of problems." Citing a precedent decision involving a worker who voluntarily left work in anticipation of a discharge for unsatisfactory performance,[8] he concluded that Douglas and Sanchez had voluntarily quit their jobs without good cause and were thus disqualified under section 1256 of the code. The claimants then appealed to the board. (§ 1336.)

After the referee's hearing, but prior to the board's consideration of claimants' appeal, the NLRB administrative law judge (ALJ) announced her decision in the complaints Douglas, Fragua-Lloyd, Mannes and TEWA had filed against TACC.[9] The ALJ found that the August letter to TACC's funding agencies was concerted activity protected by the National Labor Relations Act (NLRA);[10] that Fragua-Lloyd and Douglas had been demoted in violation of the NLRA in retaliation for protected concerted activity; that the TEWA's October press meeting was directly related to employee concerns over terms and conditions of employment, including the preservation of their jobs, and was therefore protected concerted activity within the meaning of the NLRA; that Fragua-Lloyd was fired for union activity in violation of the NLRA; that Gibbs had ordered Manness to reprimand Sanchez "in an attempt to build a disciplinary record which could be used as justification for discharging [her] because of [her] union activities," and

---

[7]In response to claimants' initial applications for unemployment compensation, Employment Development Department representatives telephoned Karen von Hoy, TACC director of education. Ms. von Hoy denied that TACC had harassed or improperly retaliated against Douglas and Sanchez, and denied Douglas's charges of noncompliance with state regulations. Apart from these telephone contacts, TACC has presented no evidence at any stage of these unemployment proceedings.

[8]*In re Tucker* (1955) Cal. Unemp. App. Bd. Precedent Benefit Dec. No. P B 228.

[9]The ALJ's decision was announced on September 17, 1980. Thus, it was not available to the referee, whose hearing was held on July 29, 1980, and whose decision was announced on August 12, 1980. The text of the decision was, however, submitted to the appeals board along with claimants' brief on appeal on October 15, 1980. The board is statutorily empowered to receive additional evidence. (§ 1336.) The decision was therefore properly included in the administrative record lodged with the superior court in conjunction with the claimants' petition for writ of mandate, filed August 17, 1981.

[10]29 United States Code section 141 et seq.

that the termination of Manness for refusing to commit an unfair labor practice was in violation of the NLRA. (The ALJ did not consider, and the decision did not discuss, incidents subsequent to Manness's termination on Dec. 4, 1979.)

Nonetheless, early in 1981, the Unemployment Insurance Appeals Board affirmed the referee's decision to deny unemployment benefits and adopted his statement of facts and reasons for decision as its own. The claimants then commenced this mandamus proceeding in the superior court pursuant to section 1094.5 of the Code of Civil Procedure. In their petition, claimants named the board as respondent and sought a writ of mandate requiring it to set aside the administrative determinations mentioned. They appeal from a minute order judgment denying their petition.

## II.

Section 1256 provides, so far as pertinent here, that "[a]n individual is disqualified for unemployment compensation benefits if . . . he or she left his or her most recent work voluntarily without good cause . . . ."

■ The provisions of the Unemployment Insurance Code must be liberally construed to further the legislative objective of reducing the hardship of unemployment. (*Gibson* v. *Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 499 [108 Cal.Rptr. 1, 509 P.2d 945].) ■ The term "good cause" as used in the statute means an adequate cause, a cause that comports with the purposes of the Unemployment Insurance Code and with other laws. (*Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 5 [192 Cal.Rptr. 134, 663 P.2d 904].)

We have previously stated "[i]n view of the statutory objectives . . . the concept of 'good cause' cannot be arbitrarily limited; the board must take account of 'real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith.'" (*Gibson, supra,* 9 Cal.3d at p. 499, fn. 8, quoting *Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board* (1960) 178 Cal.App.2d 263, 272-273 [3 Cal.Rptr. 37].)

Accordingly "'"[G]ood cause," . . . means such a cause as justifies an employee's voluntarily leaving the ranks of the employed and joining the ranks of the unemployed; the quitting must be for such a cause as would reasonably motivate in a similar situation the average able-bodied and qualified worker to give up his or her employment with its certain wage rewards in order to enter the ranks of the compensated unemployed.'" (*Zorrero* v.

*Unemployment Ins. Appeals Bd.* (1975) 47 Cal.App.3d 434, 439 [120 Cal.Rptr. 855], quoting 81 C.J.S., Social Security and Public Welfare, § 167, p. 253.)

█ "In reviewing a decision of the Board, the superior court exercises its independent judgment on the evidentiary record of the administrative proceedings and inquires whether the findings of the administrative agency are supported by the weight of the evidence." (*Lozano* v. *Unemployment Ins. Appeals Bd.* (1982) 130 Cal.App.3d 749, 754 [182 Cal.Rptr. 6], citing Code Civ. Proc., § 1094.5, subds. (b), (c).) █ In reviewing the trial court's ruling on a writ of mandate, the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence. (*Lozano, supra.*) █ However, the determination whether an applicant for unemployment insurance had "good cause" to leave employment is an issue of law. (*Norman, supra,* 34 Cal.3d at p. 6.) █ And, as we made clear in *Amador* v. *Unemployment Ins. Appeals Bd.* (1984) 35 Cal.3d 671, 679 [200 Cal.Rptr. 298, 677 P.2d 224], where the probative facts are not in dispute, and those facts clearly require a conclusion different from that reached by the trial court, the latter's conclusions may be disregarded.

III.

█ In this case, the administrative determinations were clearly based upon a legally erroneous standard of "good cause." The trial court, then, erred as a matter of law in denying the claimants' petition for a writ of mandate.

The referee and the board relied upon precedents holding that workers about to be discharged for cause may not anticipate a discharge by resigning and still collect unemployment benefits. This approach comports with the basic purpose of the unemployment insurance law to alleviate the burden on the unemployed resulting from involuntary unemployment through no fault of the employee. (§ 100; *Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board, supra,* 178 Cal.App.2d 263, 270.)

However, the simple rule that an employee who voluntarily leaves work in anticipation of discharge is disqualified from collecting unemployment benefits is inadequate in situations where the employee is subjected to a continuing course of illegal discrimination.

█ A finding merely that a worker left "in anticipation of problems" is not conclusive on the issue whether she had "good cause" to leave under section 1256. Several California cases have established that a worker who

suffers illegal discrimination at the workplace has "good cause" to resign. In such a case, an employee who reasonably believes that illegal discrimination or harassment at the workplace will continue may well have "good cause" to resign "in anticipation of problems."

*Prescod* v. *Unemployment Ins. Appeals Bd.* (1976) 57 Cal.App.3d 29 [127 Cal.Rptr. 540] is a case in point. Ms. Prescod, after returning to her employment from maternity leave, was first refused reinstatement, then rehired in a lower grade but with the same pay. As a result, she was subsequently deprived of a promotional opportunity. She quit, claiming that her departure was for "good cause" because the employer's conduct toward her was in violation of applicable federal and state law prohibiting discrimination on account of sex. The unemployment compensation referee ruled against her, concluding that she had not left for "good cause" but because she was dissatisfied with her position and the unavailability of transfers. The board affirmed, indicating that discrimination had not been shown and that if Ms. Prescod believed her employer had violated fair employment practices she could have filed charges with the appropriate agency and continued to work.

The Court of Appeal in *Prescod* reversed, and held as a matter of law that an employee who suffers from illegal sexual discrimination over a period of time may have good cause for quitting her employment. Finding that the employer's conduct violated applicable Equal Employment Opportunity Commission guidelines, the court noted our decisions in *Bunny's Waffle Shop* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 735 [151 P.2d 224] (holding that a 25 percent wage cut constituted "good cause" for quitting) and in *Syrek* v. *California Unemployment Insurance Appeals Board* (1960) 54 Cal.2d 519 [7 Cal.Rptr. 97, 354 P.2d 625] (holding that there was "good cause" to refuse available work where the individual could not conscientiously subscribe to a loyalty oath required as a condition of the position refused), and reasoned: "Surely, then, where one's work is made intolerable over a period of time by the discriminatory acts of the employer, . . . as in the instant case, there is good cause for leaving employment. Assuring an individual unemployment benefits in such situations does insure him against the impact of leaving adverse working conditions not voluntarily created by him and thus comports with the purposes of the unemployment insurance laws." (57 Cal.App.3d at p. 41.)

The *Prescod* court considered, but declined to follow, a contrary opinion by the Court of Appeal in *Warriner* v. *Unemployment Ins. Appeals Bd.* (1973) 32 Cal.App.3d 353 [108 Cal.Rptr. 153]. In that case, a woman left her job after being demoted and replaced by a man whom she was then asked to train pursuant to the new policy of her employer, that all super-

visory personnel should be male. In affirming the denial of unemployment benefits, the *Warriner* court held that even if the employer's conduct was unlawful the employee's "remedy was to proceed by appropriate action to prevent the implementation of that policy and not to resign and seek unemployment compensation." (32 Cal.App.3d at p. 359.)

In *Morrison* v. *Unemployment Ins. Appeals Bd.* (1976) 65 Cal.App.3d 245 [134 Cal.Rptr. 916], the Court of Appeal chose to follow *Prescod,* rather than *Warriner,* in holding that a woman had good cause for quitting her job when her employer failed, after demand, to correct unlawful wage disparities between male and female employees. The court reasoned: "The existence of a claim by an employee based on past discrimination which has now ceased should not afford good cause to leave employment voluntarily. Methods are available for enforcing such a claim by legal process. [¶] But the goading irritation of continuing unjust treatment by an employer can well have an eroding effect upon employer-employee relations . . . . The employee need not be subjected to that dilemma." (65 Cal.App.3d at p. 253.)

We believe that the decisions in *Prescod* and *Morrison,* rather than *Warriner* best reflect the objectives and policies of the Unemployment Insurance Code to provide benefits for persons unemployed "through no fault of their own." (§ 100.) It is not the policy of this state to encourage employees to quit their work and obtain unemployment insurance simply because they are unhappy over something the employer has said or done; but when an employer chooses to embark upon a continuing course of unlawful discrimination, neither he nor the state can reasonably expect an employee who is an object of that treatment to remain in employment upon penalty of forfeiting benefits generally available to unemployed workers.

Accordingly, we conclude that a worker who is subjected to illegal discrimination on the part of her employer and who reasonably and in good faith believes that such discrimination will continue as long as she remains on the job has "good cause" to leave her employment voluntarily under the terms of section 1256.[11] We disapprove of *Warriner* to the extent it is inconsistent with this analysis.

### IV.

Ms. Douglas was demoted in August 1979 in retaliation for her union activities. As a result, she suffered a loss of a position with higher salary

---

[11]We here adopt the standard of reasonable belief recently articulated in *Amador:* ". . . 'from [the worker's] standpoint in the light of the circumstances facing [her] and the knowledge possessed by [her] at the time.'" (*Amador, supra,* 35 Cal.3d at p. 683, fn. 9, italics omitted.)

and increased responsibility. That loss did not cease with her demotion; it continued throughout the period of her remaining employment. Throughout that period, she and other union activists were the objects of continuing surveillance and harassment by Gibbs, whose desire to find some basis for discharging them was evident. Several illegal firings did occur. Throughout the fall, Gibbs explicitly identified Douglas among the employees he intended to discharge. On March 7, Douglas received an official letter of reprimand based on her contacts with a government agency concerning various work-related problems, including an asserted failure to comply with state guidelines on adult-child ratios. Two weeks later, rather than wait for the axe to fall, she resigned.

■ Discrimination for union activities is, of course, contrary to both federal and state law. (*Glenn* v. *Clearman's Golden Cock Inn* (1961) 192 Cal.App.2d 793 [13 Cal.Rptr. 769].) ■ A complaint to a government agency expressing concerns about personnel practices and procedures is itself protected activity under the NLRA. (*Richboro Community Mental Health Council, Inc.* (1979) 242 NLRB 1267; *St. Joseph's High School* (1978) 236 NLRB 1623.) ■ Moreover, when the employer is funded with public money, as here, good faith complaints by employees to relevant government agencies concerning possible misuse of government funds must also be deemed protected against employer discrimination, as a matter of public policy. (See *Barela* v. *Superior Court* (1981) 30 Cal.3d 244, 252 [178 Cal.Rptr. 618, 636 P.2d 582]: "California has a long history of protecting those citizens who report violations of the criminal laws. . . . Laws which define certain acts as criminal would be meaningless if citizens who reported crime were not protected from vindictive retaliation.")[12] ■ Thus, the entire pattern of discrimination and harassment against Ms. Douglas was unlawful, and constituted good cause for her resignation.

---

[12]Several jurisdictions have allowed workers discharged for "blowing the whistle" on crime or abuses at the work place to maintain a cause of action in wrongful discharge. (See, e.g., *Harless* v. *First Nat. Bank in Fairmont* (1978) 162 W.Va. 116 [246 S.E.2d 270] [employee informed superiors of violations of state and federal laws]; *Sheets* v. *Teddy's Frosted Foods, Inc.* (1980) 179 Conn. 471 [427 A.2d 385] [employee reported possible violation of state food and drug law to superiors]; *Palmateer* v. *International Harvester Co.* (1981) 85 Ill.2d 124 [421 N.E.2d 876] [employee reported fellow worker's criminal activity to law enforcement officials and agreed to assist in subsequent investigation and trial].) In addition a number of commentators have urged the adaptation of this tort theory as a means of protecting whistle blowers in private employment. (See, e.g., *At-Will Employment and the Problem of Unjust Dismissal,* Report by Committee on Labor and Employment Law, 36 Rec. A.B. City N. Y. 170 (1981); Malin, *Protecting the Whistleblower From Retaliatory Discharge* (1983) 16 U.Mich.J.L.Ref. 277; Comment, *Protecting the Private Sector At Will Employee Who "Blows the Whistle": A Cause of Action Based Upon Determinants of Public Policy* 1977 Wis.L.Rev. 777.)

We need not here determine the precise scope of protection to be afforded whistleblowers in other contexts.

The predicament of Ms. Sanchez was hardly better. Although she herself was not successfully demoted, terminated, or directly reprimanded for her legitimate activities, it was not for want of desire or intent to do so on the part of her employer. The effort to subject her to an unlawful reprimand was thwarted only by the integrity of a conscientious supervisor who lost her own job by refusing Gibbs's order. ■ Discriminatory acts against supervisory personnel based upon the supervisor's refusal to commit unfair labor practices are themselves illegal precisely because of the coercive effects such acts have upon employees in the exercise of their NLRA rights. (Cash Markets, Inc. d/b/a Gerry's (1978) 238 NLRB 1141, 1151.)

In addition to her knowledge of the failed disciplinary attempt, Sanchez was aware that Gibbs had specifically referred to her as a "troublemaker and ringleader" on numerous occasions. She had also witnessed the systematic harassment of her fellow union officials, including the unlawful demotion of the union president, and the unlawful demotion and reprimand of her co-vice president. After Douglas's resignation, Sanchez was the ranking union official remaining in TACC's employ and she could reasonably anticipate that she would become the primary focus of Gibb's antiunion animus.

■ By virtue of the particular unlawful actions already directed at her personally and at those occupying the union role which she was about to assume by default, Sanchez occupied a substantially more difficult and vulnerable position than employees who, while unfortunate enough to be in an unpleasant employment situation, are not themselves specific targets of improper activities by the employer. Under the circumstances, no useful purpose would be served by requiring an employee such as Sanchez to hold her place as a "sitting duck" whose position could reasonably be anticipated to last only as long as her employer's persistent barrage did not hit home. Accordingly, we conclude that both Douglas and Sanchez are entitled to unemployment compensation.[13]

The judgment is reversed. The trial court is directed to issue its writ of mandate ordering respondent to pay appellants the unemployment insurance benefits withheld.

Bird, C. J., Kaus, J., Broussard, J., and Reynoso, J., concurred.

---

[13]In light of this disposition of the case, the court need not reach the petitioners' claim that denial of unemployment compensation constituted state action in violation of their constitutional right to free expression. (See *Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707 [67 L.Ed.2d 624, 101 S.Ct. 1425] [Jehovah's Witness left job rather than work in arms production]; *King* v. *California Unemployment Ins. Appeals Bd.* (1972) 25 Cal.App.3d 199 [101 Cal.Rptr. 660] [employee left his job voluntarily rather than comply with employer's order to shave].)

**MOSK, J.**—I concur, only because the facts of this case are so egregious as to make it evident there was good cause for the claimants to voluntarily terminate their employment.

This case should provide no precedent for other employees who voluntarily resign from continuous employment merely because the environment is not free of conflict, or because associates and superiors are imperious. While one must sympathize with employees who labor in an unhappy or contentious atmosphere, that circumstance alone does not justify voluntary termination and unemployment benefit claims. Nor are such claims proper when an employee resigns merely in anticipation, real or fancied, of possible firing or discipline at some vague time in the future. A foreseeably imminent discharge or unjustified discipline is required. As declared in *Zorrero* v. *Unemployment Ins. Appeals Bd.* (1975) 47 Cal.App.3d 434, 439 [120 Cal.Rptr. 855], voluntary termination must "be based on serious and exigent circumstances."

With the foregoing caveat, I join my colleagues in finding good cause in this *sui generis* fact situation.

Lucas, J., concurred.