[No. H026717. Sixth Dist. June 15, 2004.]

In re the Marriage of LESLIE and MARK LEONARD.
LESLIE BAYES, Respondent, v.
MARK LEONARD, Appellant.

**COUNSEL**

Law Office of Mark Portman and Mark Portman for Appellant.

No appearance for Respondent.

## Opinion

**WALSH, J.**—A father had been paying child support for many years. In January 2003, he was laid off from his job as a software salesman due to the economic downturn in the high technology field. Accordingly, he filed a motion (motion) to reduce his child support obligation and requested—under Family Code section 3653, subdivision (b) (section 3653(b))[1]—that the modification order be made retroactive to the date he served the motion. The mother opposed the motion.

The court granted the motion in part by reducing monthly child support, but refused to make the order retroactive. Concluding that the father had other financial resources and that the needs of the children would make retroactivity inappropriate and unfair, the court made the order effective on the date of the hearing on the motion.

The father appeals the trial court's failure to reduce the child support obligation retroactively. He claims that the court abused its discretion under section 3653(b) by not making the order effective on the date the motion was served.

■ Under section 3653(b), if a court modifies or terminates a support order because of a party's unemployment, the trial court *must* make its order retroactive unless it finds good cause to deny retroactivity and specifies its reasons. The statute, however, does not define "good cause" justifying a trial court's denial of retroactivity.

We define good cause as it applies to section 3653(b). We determine that the court provided specific reasons for its order, supported by the evidence, sufficient to constitute good cause. We conclude that the trial court did not abuse its discretion by denying the father's request for retroactivity. Accordingly, we affirm the trial court's order.

### FACTS

I. *The Parties And Their Children.*

Appellant, Mark Leonard (Mark)[2] and respondent, Leslie Bayes (Leslie) were married for approximately nine years. They had four children

---

[1] All statutory references are to the Family Code unless otherwise indicated.

[2] For the sake of clarity, we refer to the parties by their first names. We mean no disrespect in doing so. (See *Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1 [97 Cal.Rptr.2d 707].)

together—a 20-year-old daughter who attends college, an 18-year-old son, and two children residing with Leslie, ages 16 and 15.

Leslie received child support for approximately 10 years. Pursuant to a prior stipulation and order, Mark was to pay guideline child support for the two minor children totaling $2,223 per month, effective December 1, 2002. Because he was laid off from his employment, Mark unilaterally reduced the amount he paid as monthly support between February and July 2003. From January through July 2003, he made aggregate child support payments of $5,700.

## II. *Leslie's Financial Condition.*

Leslie is a 50-year-old, self-employed, academic tutor. According to her profit and loss statement,[3] the gross income for Leslie's tutoring business for 2002 was $44,954 and she received wages of $29,425. In her income and expense declaration filed in opposition to the motion, Leslie stated that her average gross monthly income and average net monthly income for the 12 months prior to January 2003 were $2,366 and $2,006, respectively.[4]

There was evidence of significant fluctuation in Leslie's monthly income between January and June 2003; there were periods in the first half of 2003 in which her monthly income was significantly less than her average income for 2002. Leslie declared that her gross monthly income and net monthly income for January 2003 were $900 and $572, respectively. Her gross monthly income and net monthly income for June 2003 were $870 and $820, respectively.

Leslie's monthly expenses as of January 2003 were $3,922. Her monthly expenses as of July 2003 were $4,638. These expenses listed as of July 2003 included educational expenses for the two minor children totaling $2,200 annually.

Leslie held cash and checking accounts totaling $25. She estimated that her equity in real property was $175,000. Leslie identified no other assets.

---

[3] Both Leslie's and Mark's financial information described herein are taken primarily from the income and expense declarations (two by each party) filed by the parties in connection with the motion. There were no significant contested issues at the hearing concerning the parties' respective financial information. The primary contested issues were whether the termination of Mark's employment with iManage, Inc. (iManage) was involuntary, and whether income should be imputed to Mark in an amount greater than his actual income.

[4] The court's order modifying support utilized the figure of $2,745 for Leslie's gross monthly income. The figure was supplied by Mark as part of his calculations dated July 22, 2003 under the uniform support guideline. It was reiterated by Mark's counsel at the hearing on the motion, and there was no objection by Leslie to this figure.

### III.  *Mark's Financial Condition.*

Mark is a 52-year-old unemployed software salesman. He has an MBA degree. Mark earned wages in 2002 of $188,909, approximately half of which consisted of sales commissions. His average gross monthly income and average net monthly income for the 12 months prior to January 2003 were $14,833 and $9,142, respectively. Mark's gross monthly income and net monthly income for January 2003 were $8,700 and $5,441, respectively.[5] His gross monthly income and net monthly income for May 2003 were $1,480 and $1,192, respectively. His former employer, iManage, provided him with severance pay of $3,653 and accrued vacation of approximately $900.

Mark declared that his total monthly expenses as of January 2003 were $7,655 (and $150 lower in June 2003). Included in his expenses was a monthly figure of $850 as a voluntary contribution for the education of the parties' elder daughter.

Mark's real and personal property had a combined value of $620,000. These assets included a sailboat (one-half interest) in which his estimated equity was $24,500. His cash and checking accounts totaled $1,000. Mark owned stocks, bonds, and other liquid assets totaling $55,000.

### IV.  *Mark's Changed Circumstances.*

On January 10, 2003, Mark was laid off from his software sales position with iManage, where he had worked since April 2001. Mark testified that his termination was involuntary. Over Leslie's opposition, the court ultimately found that to be the case.

Because of the downturn in the economy and the weakening of jobs in his area, Mark decided after being laid off that he would become self-employed in the franchise business that he and his wife had begun to develop in mid-2002 (discussed *post*). This decision was reflected in both his January 2003 declaration and in his testimony at the July 2003 hearing. Mark declared that iManage had been laying off staff continuously for a period of over six

---

[5] In addition, Mark's wife had a monthly salary of $16,000 as of January 2003 and a monthly salary of $12,000 as of June 2003. Mark contends that the trial court improperly considered this income in its denial of Mark's request that support be reduced retroactively. There is no evidence to support this assertion. Indeed, Leslie's counsel admitted that the income of Mark's spouse could not be used in determining the amount of child support that Mark should pay. We do not consider these salary figures in reviewing the order appealed from. (See § 4057.5, subd. (a)(1) [income of subsequent spouse of obligor not considered in determining or modifying child support, absent "an extraordinary case where excluding that income would lead to extreme and severe hardship" of supported child]; *In re Marriage of Wood* (1995) 37 Cal.App.4th 1059, 1067 [44 Cal.Rptr.2d 236].)

months before his January 2003 layoff and that there was no possibility that he would be called back to work. He testified that, before his termination, he made inquiries about opportunities to stay in the high technology field, "but high tech has been devastated, as is well-documented, and decided to devote full-time attention to creating a business that is very predictable . . . that could afford [him] the same level of income as [he] had previously earned." Mark also testified that, after being laid off, he continued to make inquiries of people he knew in the industry and concluded that his chances of locating another position were very poor.

Since around mid-2002, Mark and his wife had planned to own and operate a Subway sandwich shop in San Francisco. They had expended approximately $25,000 toward this venture up to July 2003. Originally, Mark and his wife had intended that she would run the business, as she was not employed for most of 2002. Since she received another contract to work elsewhere and because Mark was laid off, they later decided that Mark would operate the business. As of the time of the July 2003 hearing, Mark expected that the store would be operating in October 2003. He estimated that, based upon the income figures for other franchises, his store would have approximate monthly profits of $10,000 after one year of operation.

## PROCEDURAL HISTORY

Mark filed and served the motion for modification of child support on January 8, 2003. Mark sought a modification of a prior order entered pursuant to stipulation, under which he paid monthly child support for two minor children in the total amount of $2,223. He requested that the proposed order modifying child support be made retroactive to the date of service of the motion.

Mark alleged in support of the motion that he had been involuntarily laid off in January 2003 by iManage. He alleged further that, given the downturn in the high technology market and his knowledge that colleagues in the industry had been unable to find work, he had decided to become self-employed by developing a Subway sandwich franchise business in San Francisco.

Leslie's opposition to the motion requested that the court establish guideline support by determining Mark's actual earning ability and by imputing income based upon his prior earnings. Leslie's declaration urged that "[t]he court should not allow [Mark] to shirk his child support obligations . . . [after his] job mysteriously disappeared at the beginning of this year just after he

had to start paying . . . $2,000.00 per month in child support." Her declaration indicated, inter alia, that Mark's request should be denied and child support should be established based upon imputed income of $189,000 per year. She also requested that she be awarded attorney's fees of at least $3,000.

After a specially set hearing on July 23, 2003, the court entered an order on August 1, 2003, in which it (1) granted Mark's motion for modification of child support, (2) ordered that child support be reduced from $2,223 to $423 per month (as requested by Mark), (3) made the reduction order effective July 23, 2003, and (4) denied Leslie's cross-motion for attorney's fees. In its order, the court expressly found that Mark "did not voluntarily terminate employment with iManage and that he has been making good faith efforts in the current economy to produce a higher income not only for himself but for the minor children as well."

On August 8, 2003, Mark filed alternative motions for new trial (Code Civ. Proc., § 657, subds. 4 & 6), to reconsider (Code Civ. Proc., § 1008, subd. (a)), or to vacate the prior order (Code Civ. Proc., § 663) (alternative motions). The court denied Mark's alternative motions on October 31, 2003. It stated: "I would amplify the Court's order that I made previously by saying that in doing that, I—at least mentally but didn't articulate in the order that I made, findings in doing that, which included the respondent's other resources, . . . I am persuaded that the Padilla case [*In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212 [45 Cal.Rptr.2d 555] (*Padilla*)] and [its] reasoning . . . [are] persuasive . . . . [¶] I felt on balance that, in fact, making the finding that I did was equitable for both parties. And in fact, if I had made the order retroactive to the date of its original filing, I think Mr. Leonard would have had some period of time where he wouldn't have had to make any payments because it would have been basically a credit for some period of time, which in light of the needs of the children didn't seem to me to be appropriate or fair." Later during the hearing, the court stated that "the priority number one is the support of the children."

Mark filed a notice of appeal on November 6, 2003. The court's order granting Mark's motion to modify his child support obligation is an appealable order. (See § 3554; Code Civ. Proc., § 904.1, subd. (a)(10); *County of Los Angeles v. Patrick* (1992) 11 Cal.App.4th 1246, 1250 [14 Cal.Rptr.2d 665].)

## DISCUSSION

### I. *Standard Of Review.*

■ A trial court's award concerning child support is reviewed for abuse of discretion. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282 [111 Cal.Rptr.2d 755] (*Cheriton*); see also *In re Marriage of Chandler* (1997) 60 Cal.App.4th 124, 128 [70 Cal.Rptr.2d 109]; *In re Marriage of Wood, supra,* 37 Cal.App.4th at p. 1066.) Likewise, a determination regarding a request for modification of a child support order will be affirmed unless the trial court abused its discretion, and it will be reversed only if prejudicial error is found from examining the record below. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139 [62 Cal.Rptr.2d 466]; see also *In re Marriage of McCann* (1996) 41 Cal.App.4th 978 [48 Cal.Rptr.2d 864].) In addition, a trial court's decision whether to make an order for child support retroactive is reviewed under an abuse of discretion standard. (*In re Marriage of Drake, supra,* 53 Cal.App.4th at p. 1169.)

Of course, the trial court's discretion is not unfettered. It has " 'a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . .' (*In re Marriage of Muldrow* (1976) 61 Cal.App.3d 327, 332 [132 Cal.Rptr. 48].)" (*Cheriton, supra,* 92 Cal.App.4th at pp. 282–283.) Moreover, we are mindful that the deferential standard concerning child support orders is tempered significantly by this state's uniform child support guideline (§ 4050 et seq.): "The present statutory scheme limits the broad discretion accorded to the trial court under prior law and channels its remaining discretion within the new statutory parameters. [Citation.]" (*In re Marriage of Drake, supra,* 53 Cal.App.4th at p. 1159.) "In short, the trial court's discretion is not so broad that it 'may ignore or contravene the purposes of the law regarding . . . child support. [Citations.]' (*County of Stanislaus v. Gibbs* (1997) 59 Cal.App.4th 1417, 1425 [69 Cal.Rptr.2d 819].)" (*Cheriton, supra,* 92 Cal.App.4th at p. 283.)

The order challenged on appeal by Mark concerned the modification of child support after a judgment of dissolution. Accordingly, we review the order under an abuse of discretion standard.

### II. *Child Support.*

■ "The duty of a parent to support the parent's child or children is a fundamental parental obligation." (*Moss v. Superior Court* (1998) 17 Cal.4th 396, 405 [71 Cal.Rptr.2d 215, 950 P.2d 59]; see also § 3900.) Our state has a strong public policy that favors adequate child support. (See, e.g., *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1455 [89 Cal.Rptr.2d 874]; *Stewart v. Gomez* (1996) 47 Cal.App.4th 1748, 1754 [55 Cal.Rptr.2d 531].)

Our statutes clearly reflect this policy in their uniform child support guideline. (See §§ 4050–4076.) " 'The guideline seeks to place the interests of children as the state's top priority.' (§ 4053, subd. (e).) In setting guideline support, the courts are required to adhere to certain principles, including these: 'A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life.' (§ 4053, subd. (a).) 'Each parent should pay for the support of the children according to his or her ability.' (§ 4053, subd. (d).) 'Children should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children.' (§ 4053, subd. (f).)" (*Cheriton, supra,* 92 Cal.App.4th at p. 283.) Further, there is a presumption that the custodial parent "contributes a significant portion of available resources for the support of the children." (§ 4053, subd. (i).) As an overarching concern, "[c]hild support orders must ensure that children actually receive fair, timely, and sufficient support reflecting the state's high standard of living and high costs of raising children compared to other states." (§ 4053, subd. (*l*).)

■ An order of child support "may be modified or terminated at any time as the court determines to be necessary." (§ 3651, subd. (a).) Statutory procedures for modification of child support "require a party to introduce admissible evidence of changed circumstances as a necessary predicate for modification." (*Cheriton, supra,* 92 Cal.App.4th at p. 298; see also *In re Marriage of Brinkman* (2003) 111 Cal.App.4th 1281, 1292 [4 Cal.Rptr.3d 722].) The burden of proof to establish that changed circumstances warrant a downward adjustment in child support rests with the supporting spouse. (See *In re Marriage of Stephenson* (1995) 39 Cal.App.4th 71, 77, 83, fn. 7 [46 Cal.Rptr.2d 8] [modification of spousal support].)

■ "Ordinarily, a *factual* change of circumstances is required [for an order modifying support] (e.g., increase or decrease in either party's income available to pay child support)." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2004) ¶ 17:26, p. 17-10.) "There are no rigid guidelines for judging whether circumstances have sufficiently changed to warrant a child support modification. So long as the statewide statutory formula support requirements are met (Fam. [Code,] § 4050 et seq.), the determination is made on a case-by-case basis and may properly rest on fluctuations in *need* or *ability to pay*." (*Id.* at ¶ 17:40, p. 17-13; see also *In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1015 [112 Cal.Rptr.2d 378].) The ultimate determination of whether the individual facts of the case warrant modification of support is within the discretion of the trial court. (*Philbin v. Philbin* (1971) 19 Cal.App.3d 115, 119 [96 Cal.Rptr. 408].) The reviewing court will resolve any conflicts in the evidence in favor of the trial court's determination. (*In re Marriage of Kepley* (1987) 193 Cal.App.3d 946, 951 [238 Cal.Rptr. 691].)

III. *The Order Modifying Child Support.*

A. *Family Code section 3653, subdivision (b).*

■ Section 3653(b) is the statute central to this appeal. It provides as follows: "If an order modifying or terminating a support order[6] is entered due to the unemployment of either the support obligor or the support obligee, the order shall be made retroactive to the later of the date of the service on the opposing party of the notice of motion or order to show cause to modify or terminate or the date of unemployment, . . . unless the court finds good cause not to make the order retroactive and states its reasons on the record." (§ 3653(b).) The language of the statute thus *requires* the court to make retroactive the order modifying or terminating support due to the parent's unemployment, unless it makes a specific finding of good cause and specifies on the record its reasons for denying retroactivity.

The statute does not define the circumstances under which the court may find good cause to deny retroactivity. Further, the parties cite no cases—and we are aware of none—that either discuss section 3653(b) generally or analyze the statute's "good cause" requirement for nonretroactivity. While there are, of course, numerous examples in which the Family Code has adopted the concept of good cause, in nearly all instances, there is no decisional authority construing "good cause" under the relevant statutes.[7] We therefore look to decisional authority outside of the Family Code for guidance in construing the requirements of section 3653(b).

---

[6] "[A]s used in this chapter [chapter 6 (Fam. Code, §§ 3650 to 3693)], 'support order' means a child, family, or spousal support order." (§ 3650.)

[7] See, e.g., section 511, subdivision (a) (confidential marriage certificates not open to public for inspection, except for good cause); former section 2024.5, subdivision (c) (parties' and their children's social security numbers placed in confidential portion of court file not disclosed except for good cause); section 2034, subdivision (a) (court, for good cause, may limit amount of family law attorney's lien on real property); section 2108 (court may order liquidation of community or quasi-community assets to avoid unreasonable market or investment risks, upon application of party and for good cause); section 2556 (court shall divide community asset or liability omitted from judgment equally, unless it finds upon good cause that interests of justice require unequal division); section 4012 (court, upon showing of good cause, may order supporting parent to give reasonable security for child support payments). The requirement of good cause under section 4012 *was*, in fact, interpreted in *In re Marriage of Drake, supra,* 53 Cal.App.4th 1139. In that case, the appellate court concluded that there was good cause to require security for a 71-year-old father's future child support payments for his adult disabled child; the court so concluded, even though there was no history of delinquency in the father's payments, because there were "concerns about the ability of a parent's estate to pay child support following the parent's death." (*Id.* at p. 1164.) Aside from the focal point of good cause resting with the court's concern that the child would continue to receive support, there is little else that we can draw upon from *In re Marriage of Drake* to assist us in addressing the question of good cause under section 3653(b).

One appellate court has noted: "The term 'good cause' is not susceptible of precise definition. In fact, its definition varies with the context in which it is used. Very broadly, it means a legally sufficient ground or reason for a certain action." (*Zorrero v. Unemployment Ins. Appeals Bd.* (1975) 47 Cal.App.3d 434, 439 [120 Cal.Rptr. 855].) Similarly, another court has stated that the phrase "good cause," "as used in a variety of contexts, . . . [has] been found to be difficult to define with precision and to be largely relative in [its] connotation, depending upon the particular circumstances of each case. [Citations.]" (*R. J. Cardinal Co. v. Ritchie* (1963) 218 Cal.App.2d 124, 144 [32 Cal.Rptr. 545].) "[T]he essential ingredients of ['good cause' are] reasonable grounds and good faith." (*Id.* at p. 145.)

Eligibility for unemployment insurance benefits is one area using the term "good cause." An employee is, of course, ineligible for benefits if he or she has left his most recent job "voluntarily [and] without good cause." (Unemp. Ins. Code, § 1256.) One court concluded that the employee's ineligibility because he or she left the employment "voluntarily and without good cause" turned on an evaluation of whether the employee's reasons were " 'real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith.' " (*Cal. Portland Cement Co. v. Cal. Unemp. Ins. Appeals Board* (1960) 178 Cal.App.2d 263, 272–273 [3 Cal.Rptr. 37], quoting *Bliley Electric Co. v. Unemployment Comp. Bd. of Rev.* (Pa. 1946) 158 Pa.Super. 548 [45 A.2d 898, 903]; see also *Sanchez v. Unemployment Ins. Appeals Bd.* (1984) 36 Cal.3d 575, 584 [205 Cal.Rptr. 501, 685 P.2d 61] [" 'good cause' . . . means an adequate cause, a cause that comports with the purposes of the Unemployment Insurance Code and with other laws"].)

Another familiar context for the element of "good cause" exists in the area of employment law. In a wrongful discharge action involving an implied-in-fact agreement not to terminate except for good cause, "[i]n deciding whether good cause exists, there must be a balance between the employer's interest in operating its business efficiently and profitably and the employee's interest in continued employment. [Citations.]" (*Walker v. Blue Cross of California* (1992) 4 Cal.App.4th 985, 994 [6 Cal.Rptr.2d 184]; see also *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 100 [69 Cal.Rptr.2d 900, 948 P.2d 412].) This definition of good cause is incorporated into the civil jury instructions applicable to wrongful termination actions. (See CACI No. 2404 (2004 ed.); former BAJI No. 10.13 (2004 ed.).)

In applying the above discussion to section 3653(b), we start by recognizing the fundamental purpose of our statutes concerning child support obligations. (See *Rabago v. Unemployment Ins. Appeals Bd.* (1978) 84 Cal.App.3d 200, 208 [148 Cal.Rptr. 499] [essential basis for determining good cause is examination of the purposes of the statute involved].) As we have noted, the statewide uniform guideline for support "seeks to place the interests of children as the state's top priority." (§ 4053, subd. (e).)[8] In the context of this state's high standard of living and high cost of child-rearing, "[c]hild support orders must ensure that children actually receive fair, timely, and sufficient support." (§ 4053, subd. (*l*).)

Other statutory principles of child support that we must consider in reviewing a trial court's finding of good cause under section 3653(b) include: "A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life" (§ 4053, subd. (a)); "[b]oth parents are mutually responsible for the support of their children" (§ 4053, subd. (b)); and "[e]ach parent should pay for the support of the children according to his or her ability." (§ 4053, subd. (d).) "The guideline takes into account each parent's actual income and level of responsibility for the children." (§ 4053, subd. (c).) Further, "[c]hildren should share in the standard of living of both parents." (§ 4053, subd. (f); see also *In re Marriage of de Guigne, supra,* 97 Cal.App.4th at pp. 1363–1364 [parent with higher standard of living has obligation to ensure that children share in that lifestyle].)

■ We conclude that "good cause" under section 3653(b) requires the court to make a good faith finding that nonretroactivity is justified by " 'real circumstances, substantial reasons, [and] objective conditions.' " (*Cal. Portland Cement Co. v. Cal. Unemp. Ins. Appeals Board, supra,* 178 Cal.App.2d at p. 272.) A determination under section 3653(b) that there is good cause to make nonretroactive the modification or termination of a prior child support order must give due consideration to the above stated statutory principles concerning child support.

---

[8] "Section 4053 gives a court great latitude in applying its principles to individual cases." (*In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1366 [119 Cal.Rptr.2d 430].) However, "[s]ection 4053 makes clear that the court's paramount concern in adhering to or departing from the guideline amount must be the interests of the children." (*Id.* at pp. 1359–1360.)

Our decision in *Cheriton, supra,* 92 Cal.App.4th 269, is instructive. In *Cheriton,* we addressed whether the trial court abused its discretion by refusing to make its order modifying child support retroactive to the date of filing of the motion under section 3653, subdivision (a).[9] Although we did not consider in *Cheriton* the question of retroactivity under section 3653(b), we held: "In exercising its discretion concerning retroactivity, the trial court was required to analyze the children's then current needs, as measured by the parents' ability to provide support." (*Cheriton, supra,* 92 Cal.App.4th at p. 300.) Because there the trial court's focus was on the parents' expenses and it did not adequately consider the children's needs, we concluded that the court had abused its discretion in evaluating the issue of retroactivity. (*Ibid.*)

■ Consonant with our analysis in *Cheriton,* we glean from the principles in section 4053 that whether there is good cause to deny retroactivity under section 3653(b) requires an evaluation of the children's needs at the time. Those needs of the children must be examined in the context of the then-existing ability of the parents—both custodial and noncustodial—to provide child support.[10] Therefore—borrowing from the *Walker*[11] balancing test employed in the wrongful termination setting—we believe that determining good cause under section 3653(b) requires a balancing of interests, with the primary focus being to ensure, if possible, that " 'children actually receive fair, timely, and *sufficient* support.' (§ 4053, subd. (*l*), italics added.)" (*Stewart v. Gomez, supra,* 47 Cal.App.4th at p. 1754.)

■ This balancing includes an evaluation of the needs of the minor children and the potential hardship resulting to them from the retroactive reduction or termination of support. Since each parent is obligated to provide support according to his or her ability (§ 4053, subd. (d)), the court must examine the then-existing financial circumstances of both parents. The court balances the needs of the children against the interests of the supporting parent not to be faced with an unjust and unreasonable financial burden resulting from a nonretroactive order. This latter inquiry examines the supporting parent's then-existing financial resources and ability to pay for the support of the children during the period of potential retroactivity being considered.

---

[9] Section 3653, subdivision (a) provides: "An order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date, except as provided in subdivision (b) or by federal law (42 U.S.C. Sec. 666(a)(9))."

[10] Section 3653(b) concerns the retroactivity of an order modifying or terminating a prior support order, regardless of whether such support order involves child support, family support, or spousal support. As this appeal arises from the modification of a child support order, we express no opinion regarding a trial court's determination of good cause to deny retroactivity under section 3653(b) in instances other than where the order being modified or terminated concerns child support.

[11] *Walker v. Blue Cross of California, supra,* 4 Cal.App.4th at page 994.

Since the needs of the children are of paramount concern, where retroactivity would result in demonstrable hardship to them, good cause may exist to deny a retroactive support reduction or termination when the supporting parent has the ability to bear that financial burden.

### B. *Good cause for denial of retroactivity.*

We apply the above principles to determine whether the court abused its discretion by denying Mark's request to make the order reducing child support retroactive to the date of service of the motion. This involves an evaluation of whether there was evidence supporting a finding of good cause to deny retroactivity under section 3653(b).

We begin by noting that the trial court did not specifically state that it found "good cause" for refusing retroactivity.[12] While desirable, we do not believe that the statute requires the incantation of the particular words "good cause," so long as the court—as was done here—complies with section 3653(b) by identifying its reasons for concluding that good cause exists to deny retroactivity. A contrary conclusion would exalt form over substance. (See, e.g., *People v. Hatch* (2000) 22 Cal.4th 260, 273 [92 Cal.Rptr.2d 80, 991 P.2d 165] [trial courts need not use specific words or recite substantial evidence standard when dismissing case pursuant to Pen. Code, § 1385, so long as they "make their rulings clear enough for reviewing courts to confidently conclude they viewed the evidence in the light most favorable to the prosecution and found that no reasonable trier of fact could convict"].)[13]

The court at the hearing on Mark's alternative motions identified its reasons for denying retroactivity: (1) doing what was "equitable for both parties"; (2) the reasoning of *Padilla, supra,* 38 Cal.App.4th 1212; (3) Mark's "other resources"; and (4) evaluation of the "needs of the children." These findings were not made at the time the motion was originally decided. The court, however, had the power to amend or correct its order when it was subject to direct attack by Mark's motion for new trial (under Code Civ.

---

[12] We agree with Mark's assertion that the court's general statement, "and good cause appearing," in the introductory portion of the order was insufficient under section 3653(b) as a particular finding of good cause to deny retroactivity.

[13] A number of other cases have rejected claims of error based upon the trial court's failure to recite particular "magic words." (See, e.g., *In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1845 [40 Cal.Rptr.2d 85] [trial court need not recite "magic words" in excluding evidence under Evid. Code, § 352, as long as record manifests trial court's exercise of discretion under statute]; *People v. Garrett* (1987) 195 Cal.App.3d 795, 801 [241 Cal.Rptr. 10] [same]; *People v. Maxwell* (1981) 115 Cal.App.3d 807, 812 [171 Cal.Rptr. 579] [court need not utter "magic words 'defendant is found mentally competent' " for dismissal of proceedings under Pen. Code, § 1368, where court stated it "no longer had a doubt" as to defendant's competency].)

Proc., § 657) or his motion to vacate (under Code Civ. Proc., § 663); it did so at the time it disposed of the alternative motions. (See *Greene v. Superior Court* (1961) 55 Cal.2d 403, 405–406 [10 Cal.Rptr. 817, 359 P.2d 249].)

The first ground enunciated by the trial court—that nonretroactivity was "equitable to both parties"—was too general to constitute a "specification of reasons" as required by section 3653(b). Likewise, the trial court's unarticulated reliance upon *Padilla* was insufficient to establish good cause to deny Mark's request for retroactivity.[14]

The court's third and fourth reasons for denying retroactivity, however—evaluation of Mark's financial condition and the children's needs—*did* have significant evidentiary support. In this instance, there was a significant disparity between the overall assets of the parties that the court could have considered in evaluating the parties' financial condition and the needs of the children. Mark identified assets totaling $676,000 (home, sailboat, cash, and retirement funds). Mark also received $4,553 in severance pay and accrued vacation at or about the time he filed the motion. Leslie listed assets of $175,000 (home). Mark's monthly income—while it had averaged nearly $16,000 in 2002—had dropped significantly to $8,700 in January 2003 and $1,480 in May 2003. Leslie's monthly income—while averaging $2,366 in 2002—dropped by over 60 percent during at least portions of the period in 2003 during which Mark sought retroactivity: her monthly income was $900 in January 2003 and $870 in June 2003.

More significantly, the evidence strongly supported the trial court's consideration of the children's needs, including the significant negative cash flow experienced by Leslie. Her expenses during the period in 2003 in which Mark sought to make the order retroactive—before computing any child support income—*exceeded her income* by a range of *between $1,555 to $3,818 per month*, depending upon which monthly income and expense figures were used. Further, although not specifically articulated by the court, there was

---

[14] In *Padilla*, the court held that it was proper to impute earning capacity in determining the appropriate amount of child support where the "parent unreasonably fails to avail himself or herself of employment possibilities." (*Padilla, supra,* 38 Cal.App.4th at p. 1217.) The court rejected the notion that the parent's employment decisions had to have been in bad faith in order to impute earning capacity. (*Ibid.*) Here, the court concluded that Mark's termination was involuntary and that "he has been making good faith efforts in the current economy to produce a higher income not only for himself but for the minor children as well." Given that the trial court specifically rejected Leslie's contention that Mark's historical income level should be imputed to him as a basis for denying a reduction in child support—and did *not* conclude that Mark had "unreasonably fail[ed] to avail himself . . . of employment possibilities" (*ibid.*)—we do not view the reasoning of *Padilla* as supporting the trial court's discretion to deny retroactivity.

evidence of some disparity in the parties' respective standards of living,[15] such that denial of retroactivity would subserve the objective that the supported children "should share in the standard of living of both parents." (§ 4053, subd. (f); see also *In re Marriage of de Guigne, supra,* 97 Cal.App.4th at pp. 1363–1364.)

In light of these figures, were the court to have made the modification order retroactive, it is apparent that the two minor children would have suffered significantly as a result of their mother's inability to meet her expenses. Indeed, as the trial court recognized, had Mark's request for retroactivity been granted—because of the resulting overpayment in support paid from January to July—Leslie would have received *no* child support payments *for over five months.* Instead, Mark would have been entitled to a credit against future support payments of approximately $2,200. Under these circumstances, there was ample evidence upon which the trial court concluded that the needs of the minor children justified denying Mark's request for retroactivity.

The trial court was not unmindful that nonretroactivity might result in some hardship to Mark. After ruling on Mark's alternative motions, the court addressed potential arrangements for Mark to make up the deficit between child support payments required from January 2003 to July 2003 and the amount paid by Mark during the same period.[16] The court indicated that it would prefer to have the parties agree upon an appropriate payment plan, but stated: "The problem here is that the priority number one is the support of the children. And . . . I don't see how we're going to get around it."

It is clear therefore that the trial court was guided by our strong public policy favoring *sufficient* child support (§ 4053, subd. (*l*)), and found that—in light of the children's needs, and Mark's available resources—there was good cause to make the order modifying support nonretroactive. Under the facts presented here, we conclude that the court did not abuse its discretion in making this good cause finding.

---

[15] Leslie owned a house in Aptos in which she listed her equity interest as $175,000. She drove a three-year-old Ford Escort with 87,000 miles on it. She listed no other assets, other than a very small bank account. Mark's assets included a three-bedroom townhouse in Corte Madera, cash and checking account(s) with a total balance of $1,000, and stocks, bonds, and other liquid assets totaling $55,000. He listed his total real and personal property assets as having a combined value of $520,000. Besides his residence, these assets included a sailboat, and a Toyota Avalon of undisclosed value. Mark apparently belonged to a yacht club, and took a vacation with his wife to Europe (for which they incurred little or no travel or housing expenses because they used airline miles and stayed with relatives of Mark's wife).

[16] While the record is not complete on this issue, we calculate the amount of the underpayment to be approximately $9,300. This is consistent with the underpayment amount identified by Mark in this appeal (i.e., $9,400).

## DISPOSITION

The trial court did not abuse its discretion by denying Mark's request that the child support reduction order be made retroactive to the date of service of the motion. Therefore, we affirm the order granting modification of child support in which the reduction in support was made effective July 23, 2003.

Rushing, P. J., and Premo, J., concurred.