# IN THE SUPREME COURT OF CALIFORNIA

UNITED EDUCATORS OF SAN FRANCISCO, AFT/CFT,
AFL-CIO, NEA/CTA,
Plaintiff and Appellant,

v.

CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS
BOARD,
Defendant, Cross-defendant and Appellant;

SAN FRANCISCO UNIFIED SCHOOL DISTRICT
Real Party in Interest and Respondent.

\* \* \* \*

SAN FRANCISCO UNIFIED SCHOOL DISTRICT,
Plaintiff and Respondent,

v.

CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS
BOARD,
Defendant and Appellant.

S235903

First Appellate District, Division One
A142858 and A143428

San Francisco County Superior Court
CPF 12-512437

January 16, 2020

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar Kruger, and Groban concurred.

UNITED EDUCATORS OF SAN FRANCISCO v.
CALIFORNIA UNEMPLOYMENT INS. APPEALS BD.

S235903

Opinion of the Court by Liu, J.

Under section 1253.3 of the Unemployment Insurance Code (section 1253.3), public school employees are not eligible to collect unemployment benefits during "the period between two successive academic years or terms" if the employees worked during "the first of the academic years or terms" and received "reasonable assurance" of work during "the second of the academic years or terms." Here we address whether this limitation applies to substitute teachers and other public school employees during the summer months. We conclude that section 1253.3 does not bar such employees from collecting unemployment benefits if the summer session constitutes an "academic term." A summer session is an "academic term" within the meaning of the statute if the session, on the whole, resembles the institution's other academic terms based on objective criteria such as enrollment, staffing, budget, and the instructional program offered.

**I.**

California operates its unemployment insurance program in collaboration with the federal government. (*American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1024 (*American Federation of Labor*); see Unemp. Ins. Code, § 101; all undesignated statutory references are to this code.) As part of this arrangement, the federal government

subsidizes California's unemployment insurance fund, and California employers receive federal tax credits for their contributions to the state fund. (*Russ v. Unemployment Ins. Appeals Bd.* (1981) 125 Cal.App.3d 834, 842 (*Russ*); see 42 U.S.C. § 502(a); 26 U.S.C. § 3302(a).) In exchange, the Legislature has agreed to conform our unemployment insurance laws to requirements established by Congress. (*Russ*, at p. 842; see § 101.)

Many of these requirements are set forth in the Federal Unemployment Tax Act (FUTA). (26 U.S.C. § 3301 et seq.) In 1970, Congress passed the Employment Security Amendments of 1970, which amended FUTA to require states to provide unemployment insurance coverage to employees of state "institution[s] of higher education." (Pub.L. No. 91-373 (Aug. 10, 1970) 84 Stat. 697.) In doing so, Congress imposed the following limitation on such coverage: "[W]ith respect to service in an instructional, research, or principal administrative capacity . . . [unemployment] compensation shall not be payable based on such service for any week commencing during the period between two successive academic years (or, when the contract provides instead for a similar period between two regular but not successive terms, during such period) to any individual who has a contract to perform such services in any such capacity for any institution or institutions of higher education for both of such academic years or both of such terms . . . ." (*Ibid.*, codified in 26 U.S.C. § 3304(a)(6)(A).)

When Congress amended FUTA under the Unemployment Compensation Amendments of 1976 to require coverage of employees at most other public "educational institution[s]," it added a similar limitation: "[W]ith respect to services in an

instructional[,] research, or principal administrative capacity for an educational institution . . . [unemployment] compensation shall not be payable . . . for any week commencing during the period between two successive academic years (or, when an agreement provides instead for a similar period between two regular but not successive terms, during such period) to any individual if such individual performs such services in the first of such academic years (or terms) and if there is a contract or reasonable assurance that such individual will perform services in any such capacity for any educational institution in the second of such academic years or terms." (Pub.L. No. 94-566 (Oct. 20, 1976) 90 Stat. 2670–2671, codified in 26 U.S.C. § 3304(a)(6)(A)(i).) Congress also established that "with respect to services in any other capacity for an educational institution . . . [unemployment] compensation payable on the basis of such services *may* be denied to any individual for any week which commences during a period between two successive academic years or terms if such individual performs such services in the first of such academic years or terms and there is a reasonable assurance that such individual will perform such services in the second of such academic years or terms." (Pub.L. No. 94-566, supra, 90 Stat. 2671, codified in 26 U.S.C. § 3304(a)(6)(A)(ii), italics added.)

Congress amended FUTA again in the Emergency Unemployment Compensation Extension Act of 1977. (Pub.L. No. 95-19 (Apr. 12, 1977) 91 Stat. 39.) As relevant here, Congress added the words "or terms" after the phrase "between two successive academic years" in the provision regarding "services in an instructional[,] research, or principal administrative capacity for an educational institution" (*Id.*,

3

codified in 26 U.S.C. § 3304(a)(6)(A)(i)), thereby "clarif[ying] that the denial provisions apply between two successive terms as well as between two successive academic years" (H.R.Rep. No. 95-82, 1st Sess., p. 12 (1977)).

The Legislature responded to these changes in federal law by enacting and subsequently amending section 1253.3. (See Stats. 1971, ch. 1107, § 58, p. 2116, codified in § 1253.3, subd. (b); Stats. 1978, ch. 2, § 80, p. 42, codified in § 1253.3, subds. (b)–(c); see also *Russ*, *supra*, 125 Cal.App.3d at p. 844.) As amended in 1978, section 1253.3, subdivision (b) (section 1253.3.(b)) provides: "[W]ith respect to service in an instructional, research, or principal administrative capacity for an educational institution," unemployment benefits "are not payable to any individual with respect to any week which begins during the period between two successive academic years or terms or, when an agreement provides instead for a similar period between two regular but not successive terms, during that period . . . if the individual performs services in the first of the academic years or terms and if there is a contract or a reasonable assurance that the individual will perform services for any educational institution in the second of the academic years or terms." Section 1253.3, subdivision (c) (section 1253.3(c)) declares the same limitation on benefits for "service in any other capacity . . . for an educational institution."

## II.

This case arises from unemployment benefit claims filed by 26 employees of the San Francisco United School District (SFUSD or District) in 2011. During the 2010–2011 school year, the claimants worked for SFUSD as on-call substitute teachers or as paraprofessional classified employees such as instructional

aides and custodians. In the spring of 2011, all but one of the claimants received a letter from SFUSD providing "reasonable assurance" of employment during the 2011–2012 school year; the remaining claimant received such a letter on July 25, 2011.

The parties agree that "[t]he last date that the [SFUSD] schools operated during the 'regular' session of the 2010–2011 school year was May 27, 2011" and that "[t]he first day of instruction for the 2011–2012 school year was August 15, 2011." The parties further agree that the District operated a session of summer school from June 9, 2011 to July 7, 2011 for elementary school students, and from June 9, 2011 to July 14, 2011 for middle and high school students.

The claimants in this case did not receive regular compensation during the period from May 27, 2011 to August 15, 2011 unless they worked for the District during that period. Some claimants worked for the District intermittently during the summer school session, whereas other claimants worked continuously throughout the session. Several claimants were on call to work during summer school but ultimately were not asked to work. A number of claimants also worked for the District during the period between the end of the summer session and the start of the 2011–2012 school year. The remaining claimants did not work for the District at all over the summer and were not on call or otherwise expected to work during the summer.

Each claimant filed for unemployment benefits for the entire period between May 27, 2011 and August 15, 2011. After the Employment Development Department (EDD) denied their claims, the claimants — represented by their union, United Educators of San Francisco AFT/CFT, AFL-CIO, NEA/CTA

(UESF) — sought review by an administrative law judge. The judge reversed the EDD's decisions, reasoning that section 1253.3 did not preclude any of the claimants from collecting unemployment benefits during the period between May 27, 2011 and August 15, 2011.

The District appealed the administrative law judge's decisions to the California Unemployment Insurance Appeals Board (CUIAB or Board). As relevant here, the Board concluded that claimants who were "employed during the summer of 2010 . . . generally had a reasonable expectation of employment of work during the 2011 summer." Accordingly, the Board determined that section 1253.3 did not bar such claimants from collecting benefits for the portion of the period between May 27, 2011 and August 15, 2011 during which they expected to work but did not.

UESF subsequently petitioned the superior court for a writ of administrative mandate, arguing that section 1253.3 did not bar any claimants from collecting unemployment benefits during the entire period between May 27, 2011 and August 15, 2011 because the summer session constituted an "academic term[]" and none of the claimants were "given reasonable assurance of employment in the summer term." While this matter was pending in the superior court, the Board adopted a precedent benefit decision that is relevant here. (*Brady v. Ontario Montclair School Dist.* (Dec. 10, 2013) CUIAB, Precedent Benefit Dec., No. P-B-505 <https://www.cuiab.ca.gov/Board/precedentDecisions/docs/pb505.pdf> [as of Jan. 1, 2020] (*Brady*) (all Internet citations are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>); see § 409 ["The [CUIAB] . . . may designate

certain of its decisions as precedents. . . . The director and the appeals board administrative law judges shall be controlled by those precedents except as modified by judicial review."]; *American Federation of Labor*, *supra*, 13 Cal.4th at p. 1027 [" '[P]recedent decisions are akin to agency rulemaking, because they announce how governing law will be applied in future cases.' "].)    *Brady* involved a substitute teacher who was available and on call during a session of summer school but was not called to work during the session.    Drawing on legislative history, appellate case law, and its prior precedent benefit decisions, the Board determined that the term " 'period between two successive academic years or terms' " was "interchangeabl[e]" with " 'summer recess' " and " 'summer vacation recess.' " (*Brady*, at p. 9; see *id.* at pp. 3–9.)    Because "the claimant was qualified and eligible for work during the summer school session," the Board explained, "she was not on recess within the meaning of section 1253.3 . . . and the denial provisions do not apply for the weeks of the summer school session." (*Id.* at p. 11.)

Here, the superior court rejected *Brady* as contrary to section 1253.3's plain meaning, denied UESF's petition, and reversed and remanded the CUIAB's decisions as to all 26 claimants.    UESF appealed from the denial of its petition, and the CUIAB separately appealed from the superior court's declaration of *Brady*'s invalidity.

The Court of Appeal affirmed.    It first rejected UESF's contention that a 2005 superior court ruling in a different case had preclusive effect on the instant proceedings.    That case involved 10 substitute teachers who applied for benefits after they were unable to obtain work during SFUSD's summer

session in 2003.  The superior court in that case agreed with the
Board that section 1253.3 "only applies to periods in which a
school district is in recess" and that summer school was not such
a period.  The Court of Appeal here determined that neither
issue preclusion nor claim preclusion applied because the 2005
opinion made no reference to the relevant federal statute and
because it found applicable an exception to issue preclusion for
pure questions of law implicating the public interest.  (*United
Educators of San Francisco etc. v. California Unemployment Ins.
Appeals Bd.* (2016) 247 Cal. App. 4th 1235, 1250.)  The court
then concluded, based on the text, history, and purpose of
section 1253.3, that "summer sessions are not academic terms
and instead fall between academic years or terms under section
1253.3," and on that basis found the claimants ineligible for
benefits for the entire period from May 27, 2011 to August 15,
2011.  In so holding, the appellate court agreed with the superior
court that *Brady* cannot be reconciled with section 1253.3.  We
granted and consolidated the separate petitions for review filed
by UESF and the CUIAB.

## III.

As a threshold argument, UESF contends that issue
preclusion from the 2005 superior court judgment bars the
Board and the District from relitigating whether a summer
session is an academic term under section 1253.3(b).  While
issue preclusion generally "bars the party to a prior
action . . . from relitigating issues finally decided against [it] in
the earlier action," we have recognized a "public-interest
exception" to this rule:  " '[W]hen the issue is a question of law
rather than of fact, the prior determination is not
conclusive . . . if the public interest requires that relitigation not

be foreclosed.' " (*City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 64; see *Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 258; *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 622.)  The proper interpretation of section 1253.3 is a question of law we review de novo.  Our resolution implicates the expenditure of public funds and will affect districts and school employees throughout California.  Even if issue preclusion would otherwise apply, this is a matter where "public interest requires that relitigation not be foreclosed." (*City of Sacramento*, at p. 64.)

## IV.

We turn now to section 1253.3.  " ' "[O]ur fundamental task is 'to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " ' [Citation.]  As always, we start with the language of the statute, 'giv[ing] the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation].' [Citation.]" (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.)

## A.

Section 1253.3(b) says that public school employees "in an instructional, research, or principal administrative capacity" may not receive unemployment benefits for "any week which begins during the period between two successive academic years or terms or, when an agreement provides instead for a similar period between two regular but not successive terms, during that period, . . . if the individual performs services in the first of the academic years or terms and if there is a contract or a reasonable assurance that the individual will perform services

for any educational institution in the second of the academic years or terms." For public school employees "in any other capacity," section 1253.3(c) precludes benefits for "any week which commences during a period between two successive academic years or terms if the individual performs the service in the first of the academic years or terms and there is a reasonable assurance that the individual will perform the service in the second of the academic years or terms." The question here is whether SFUSD's summer session falls within one of section 1253.3(b)'s ineligibility "period[s]" or whether the session is itself an "academic term."

Neither section 1253.3 nor any other Unemployment Insurance Code provision defines an "academic year[] or term[]" or "the period between two successive academic years or terms." In particular, the statute does not address whether summer school, such as the District's summer session, constitutes an "academic term," a "period between two successive academic years," or a "period between two successive academic . . . terms."

In construing these phrases, we begin by noting that an "academic year" is conventionally understood to refer to a nine- or ten-month school calendar, typically running from August or September to May or June, followed by a period of summer recess. (See, e.g., Ed. Code, § 45102, subd. (c) [referring to "the regular September–June academic year"]; *id.*, subd. (d)(1) [referring to "the period between the end of the academic year in June to the beginning of the next academic year in September"].) On this view, section 1253.3 would appear to bar payment of unemployment benefits during any summer session because the session would necessarily occur during "the period between two successive academic years."

But the traditional school calendar is not the only possible definition of an "academic year." For example, the Education Code provides for the establishment of year-round school programs. (Ed. Code, § 37610 et seq.) In that context, an "academic year" means something different than the conventional school year. (See, e.g., *id.*, §§ 37620, 37630, 37632.) The term "academic year" in section 1253.3 does not necessarily exclude a year-round school program or some other variation of the school calendar that treats a summer session as part of the academic year.

The Court of Appeal concluded and the District now contends that Education Code section 37620 makes clear that an "academic year" does not include any summer sessions. (Ed. Code, § 37620 ["The teaching sessions and vacation periods established pursuant to Section 37618 shall be established without reference to the school year as defined in Section 37200. The schools and classes shall be conducted for a total of no fewer than 175 days during the academic year."].) But that provision merely establishes the minimum period of instruction for year-round school programs; it does not establish that a summer session cannot be part of an academic year. The provision says that 175 days of school must be conducted "during the academic year," not that those 175 days constitute the academic year.

We next examine the phrase "academic term." An "academic term" demarcates a period of study or instruction, such as a quarter, semester, or trimester, that is often labeled by season (e.g., fall, winter, spring, or summer). An "academic term" can be construed expansively to encompass any discrete period during which classes are held or instruction is offered. On this view, a summer session is not a "period between two

11

successive academic . . . terms" because it is itself an "academic term."

On the other hand, an "academic term" can be construed more narrowly to mean not just any instructional period, but an instructional period that meets certain objective criteria. For example, an "academic term" can be understood to encompass a typical semester or quarter during which a school offers a full curriculum and students are enrolled full-time, while excluding an intersession or summer session that offers only a limited curriculum, enrolls fewer students, or permits only part-time enrollment. On this view, whether a summer session is an "academic term" depends on its particular characteristics.

Finding "academic year" and "academic term" to be ambiguous on their own, we broaden our lens to examine these words in the context of other parts of section 1253.3. (See *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 903 [" 'Statutory language should not be interpreted in isolation, but must be construed in the context of the entire statute of which it is a part, in order to achieve harmony among the parts.' "].) As noted, section 1253.3(b) says that public school employees "in an instructional, research, or principal administrative capacity" may not receive unemployment benefits for "any week which begins during the period between two successive academic years or terms or, when an agreement provides instead for *a similar period between two regular but not successive terms*, during that period" if the employee works for the district during the first of the academic years or terms and has a reasonable assurance of work in the second academic year or term. (Italics added.) The italicized phrase offers a clue to the meaning of "academic term."

Section 1253.3(b)'s reference to "regular" terms indicates that the Legislature contemplated the existence of "regular" and non-"regular" terms, and it strongly suggests an intent to foreclose benefits during non-"regular" terms. The reason is that an agreed-upon period of benefits ineligibility "between two regular but not successive terms" is necessarily a period that includes any non-"regular" terms. In other words, contrary to the Board's arguments before this court, the statute does not envision any "agreement" under which a non-"regular" term could be a period of benefits eligibility. Section 1253.3(b) describes an agreed-upon "period [of ineligibility] between two regular but not successive terms" as "similar" to "the period [of ineligibility] between two successive academic . . . terms," implying that the latter period likewise contemplates a non-"regular" term as a period of benefits ineligibility. (§ 1253.3, subd. (b).) These two types of ineligibility periods would be quite dissimilar if one necessarily includes any non-"regular" terms while the other necessarily excludes them — yet that would be the result if non-"regular" terms counted as "academic terms" and could never fall within a period "between two successive academic . . . terms." Instead, the most natural inference is that the Legislature did not intend benefits eligibility to extend to any non-"regular" term, whether "between two regular but not successive terms" or "between two successive academic . . . terms." From this inference, it follows that the phrase "academic term" in section 1253.3(b) means a "regular" term, as does the equivalent phrase in section 1253.3(c). (See *People v. Tran* (2015) 61 Cal.4th 1160, 1168 [" ' "when statutes are *in pari materia* similar phrases appearing in each should be given like meanings" ' "].)

The statute, however, does not further define what constitutes a "regular" term. If "regular" is understood to mean "recurring . . . at fixed, uniform, or normal intervals" (Merriam-Webster, *Regular* (2019) <https://www.merriam-webster.com/dictionary/regular> [as of Jan. 9, 2020]), then a summer session that occurs every year could be characterized as a "regular" term. Alternatively, the word "regular" could mean "formed, built, arranged, or ordered according to some established rule, law, principle, or type" (*ibid.*), in which case a summer session would be a "regular" term if it conforms to a set of specifications, presumably those characteristic of the typical academic terms in the school year.

On this latter view, if a school district with conventional fall and spring semesters also offers a two-week summer session with limited offerings and limited enrollment, the summer session would not be a "regular" term. By contrast, if a school district offers a summer session that resembles the fall and spring semesters in terms of enrollment, staffing, budget, and the instructional program offered, then the summer session would qualify as a "regular" term. Although the text of section 1253.3 does not illuminate the intended meaning of "regular," the purpose and history of the provision support this latter view, as we now explain.

**B.**

As noted, the Legislature enacted and later amended section 1253.3 in response to changes that Congress made to FUTA. The text of section 1253.3 largely mirrors the text of the federal statute, and nothing in the legislative history of section 1253.3 suggests that the Legislature intended to establish different limitations on the unemployment insurance coverage

14

of school employees than those contemplated by Congress. Accordingly, FUTA's legislative history is relevant to our interpretation of section 1253.3.

Congress initially introduced the "academic years or terms" limitation in 1976 when it extended unemployment insurance coverage to employees who provided "instructional, research, or principal administrative" services to state institutions of higher education.  (Pub.L. No. 94-566, *supra*, 90 Stat. 2670.)  Because many such employees were "employed pursuant to an annual contract at an annual salary, but for a work period of less than 12 months," Congress sought to preclude them from collecting unemployment benefits during "summer periods, a semester break, a sabbatical period or similar nonwork periods during which the employment relationship continues."  (Sen.Rep. No. 91-752, 2d Sess., p. 16 (1970) (hereafter Sen.Rep. No. 91-752).)

Congress relied on a similar rationale when it mandated that states adopt essentially the same limitation for "instructional, research, or principal administrative" employees at most other public educational institutions, including school districts.  The legislative history of that limitation suggests that Congress was specifically concerned about paying unemployment benefits to school employees who, pursuant to a traditional nine-month school calendar, are required to work only from August or September to May or June of the following calendar year.  The employment contracts of such employees typically "take into account . . . a 9-month school year . . . either by paying them more during the 9 months" or by "pay[ing] a salary which is adequate to pay [them] for a year even though [they] worked for the school . . . for 9 months."  (Remarks of Sen.

Long, 122 Cong. Rec. 33285 (daily ed. Sept. 29, 1976).) In other words, although such employees are not expected to work for the school over the summer, their income is intended to be "adequate . . . to provide for [their needs] on an annual basis." (*Ibid.*) They are "really not unemployed during the summer recess" even if they are not working. (*Ibid.*) The same consideration informed Congress's authorization for states to establish a similar limitation for employees who provide "services in any other capacity for an educational institution." (Pub.L. No. 94-566, *supra*, 90 Stat. 2671, § 115(c)(1), codified in 26 U.S.C. § 3304(a)(6)(A)(ii).) Relevant remarks suggest that Congress understood such employees to be like "instructional, research, or principal administrative" employees to the extent that they are typically "engaged in seasonal employment" with a "summer vacation period[]." (Remarks of Sen. Javits, 122 Cong. Rec. 33284 (daily ed. Sept. 29, 1976).)

Thus, the legislative history of the federal statute on which section 1253.3 was modeled suggests that Congress intended to deny unemployment benefits during parts of the calendar year when employees are generally not expected to be working but remain in the employ of the school or district, i.e., "nonwork periods during which the employment relationship continues." (Sen.Rep. No. 91-752, *supra*, at p. 16.) Even if a district offers a summer session every year (i.e., the summer session is "regular" in the sense of recurring), we doubt that Congress intended school employees to be eligible for benefits during such periods if the educational program is attenuated such that most or many employees are not expected to be working.

At the same time, there is no indication that Congress intended to deny benefits to the employees of a school or district offering a summer session that, as a whole, resembles other academic terms based on objective criteria such as enrollment, staffing, budget, and the instructional program offered. Summer sessions of this kind are not materially different from other academic terms. In such circumstances, school employees are expected to work over the summer, and they expect the income from that work to provide for their needs. If, through no fault of their own, they are not asked to work as expected, then it is consistent with the purpose of unemployment insurance to provide "partial replacement of [their] wages . . . to enable [them] 'to tide themselves over, until they get back to their old work or find other employment, without having to resort to [other forms of] relief.' " (*California Dept. of Human Resources Development v. Java* (1971) 402 U.S. 121, 131, fn. omitted; cf. § 100 [noting unemployment insurance's purpose of "providing benefits for persons unemployed through no fault of their own" and "reduc[ing] . . . the suffering caused thereby to a minimum"].)

In light of the history and purpose of the federal statute, we conclude that an "academic term" for purposes of section 1253.3 may include a summer school session if, based on objective criteria, that summer session is a "regular" term comparable to other academic terms that comprise the school year. As the federal legislative history suggests, Congress had in mind a traditional nine-month school calendar and employment arrangement when it prohibited the payment of unemployment benefits between academic years or terms. But we see no evidence that Congress sought to foreclose eligibility

for benefits during a summer session that is a "regular" term occurring outside of the traditional nine-month school calendar. Notably, in the years since Congress enacted FUTA, the proportion of American teenagers enrolled in summer school has more than quadrupled: 42.1 percent of youth aged 16 to 19 were enrolled in summer school in 2016, compared to 10.4 percent in 1985. (Morisi, Teen Labor Force Participation Before and After the Great Recession and Beyond (Feb. 2017) Monthly Labor Review <https://www.bls.gov/opub/mlr/2017/article/teen-labor-force-participation-before-and-after-the-great-recession.htm> [as of Jan. 9, 2020].) Although we have no indication that all summer sessions enrolling such students are "regular" terms, it is reasonable to believe that at least some are. Our reading of section 1253.3 comports with the principle that a " 'statute may be applied to new situations not anticipated by Congress, if, fairly construed, such situations come within its intent and meaning.' " (*Twentieth Century Music Corp. v. Aiken* (1975) 422 U.S. 151, 158.)

Under today's rule, some summer sessions — such as those offered as optional or remedial programs to a subset of students on a part-time basis and requiring the participation of fewer staff than a regular semester or quarter — do not qualify as "academic terms." (See, e.g., *Community College v. Unemployment Comp. Bd. of Review* (Pa.Cmwlth.Ct. 1993) 634 A.2d 845, 847 [concluding that a summer session was not "a regular term" because it "differ[s] as to enrollment, length, and class availability" compared to the college's fall and spring terms].) In such situations, employees who expect to teach summer school or perform other services over the summer would be ineligible for benefits if they are not called to work. But other

UNITED EDUCATORS OF SAN FRANCISCO v. CALIFORNIA
UNEMPLOYMENT INS. APPEALS BD.

Opinion of the Court by Liu, J.

summer sessions — such as those in year-round schools or those that, as a whole, resemble other academic terms of the school year in terms of enrollment, staffing, budget, instructional program, or other objective criteria — would qualify as "academic terms" during which unemployment benefits are payable.

## C.

We find unpersuasive the alternative constructions of section 1253.3 offered by the District, the Board, and UESF. The District cites two guidance documents promulgated by the U.S. Department of Labor in support of its position that section 1253.3 categorically bars benefits eligibility during any non-mandatory summer session. But assuming we should assign those documents any weight (cf. *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10–15), they shed little light on the matter here. The first document says: "The period between two regular and successive terms is the short period of weeks between regular semesters or quarters, whether the institution operates on a two or three semester or a four-quarter basis. The suspension of classes during that short period in which services are not required is not a compensable period." (Unemp. Ins. Service, U.S. Dept. of Labor, Draft Language and Commentary to Implement the Unemployment Compensation Amendments of 1976—P.L. 94-566, Supplement 3 (Dec. 1976) p. 4.) This guidance does not rule out the possibility that a non-mandatory summer session may, in some circumstances, be an "academic term." More generally, the reference to institutions that "operate[] on a . . . three semester or a four-quarter basis" contemplates the possibility of a

summer session as an "academic term," contrary to the Court of Appeal's holding.

The second document notes that "the summer quarter is not a period between academic years" for colleges operating pursuant to "a 12-month academic year." (Emp. & Training Admin., U.S. Dept. of Labor, Interpretation of "Contract" and "Reasonable Assurance" in Section 3304(a)(6)(A) of the Federal Unemployment Tax Act (Dec. 2016) p. 11.) The District contends that this statement means "a summer term could only be treated as an 'academic term' if 'the college has a 12-month academic year, consisting of four quarters.' " But that is not a necessary inference; the statement does not foreclose treating a summer session as an "academic term" for a college or school district with an academic year spanning less than 12 months, where the session's staffing, enrollment, budget, instructional program, or other objective characteristics, as a whole, resemble those of the school's other academic terms.

An additional reason why we reject the District's position is that "[t]he provisions of the Unemployment Insurance Code must be liberally construed to further the legislative objective of reducing the hardship of unemployment." (*Sanchez v. Unemployment Ins. Appeals Bd.* (1984) 36 Cal.3d 575, 584; see § 100.) We would not be liberally construing section 1253.3 to further the objective of reducing the hardship of unemployment if we were to read the statute to render ineligible a class of employees whom neither Congress nor our Legislature had in mind when enacting the rule — namely, school employees who have a reasonable assurance of work during a summer session that resembles the other academic terms of the school year.

20

Meanwhile, the Board urges us to defer to *Brady*, the Board's 2013 precedent decision. (*Brady*, *supra*, CUIAB, Precedent Benefit Dec. No. P-B-505; see *ante*, at pp. 6–7.) *Brady* addressed "whether a substitute teacher may be entitled to benefits during the weeks a school district operates summer school within the meaning of section 1253.3." (*Brady*, at p. 2.) The Board held that the benefits ineligibility "period between two successive academic years or terms" in section 1253.3 refers only to periods of actual recess for the claimant, and it explained that "when a substitute teacher is 'on-call' during a summer school session, and is not called to work, the claimant is not on *recess*, but is unemployed due to a lack of work." (*Id.* at p. 9.)

Although "we give great weight to interpretations . . . rendered in an official adjudicatory proceeding by an administrative body with considerable expertise interpreting and implementing a particular statutory scheme" (*Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 158), we cannot accept the Board's interpretation of section 1253.3 if "its application of legislative intent is clearly unauthorized or erroneous" (*American Federation of Labor*, *supra*, 13 Cal.4th at p. 1027). Notwithstanding the Board's expertise in this area, we cannot square the Board's position in *Brady* that school employees are ineligible for benefits only during periods of actual recess — i.e., when they are neither working nor on-call — with section 1253.3's text and FUTA's legislative history. We thus disapprove *Brady* to the extent it is inconsistent with today's opinion.

Finally, UESF and the Board make various policy arguments for extending unemployment benefits to school employees who are on-call or expected to work during periods in

which classes are held. But as to "instructional, research, or principal administrative" employees, these arguments must be addressed to Congress because the statute originally enacted by Congress as well as the conforming statute adopted by our Legislature foreclose their eligibility for benefits during terms that are not "regular," even if classes are held and they remain on-call. (26 U.S.C. § 3304(a)(6)(A)(i) ["compensation shall not be payable"]; see § 1253.3(b).) By contrast, federal law does not prevent the Legislature from amending section 1253.3(c) to expand benefits eligibility for school employees who do not work in an instructional, research, or principal administrative capacity. As to these employees, federal law authorizes but does not require benefits ineligibility between two successive academic years or terms. (26 U.S.C. § 3304(a)(6)(A)(ii)(I) ["compensation . . . *may* be denied"], italics added.) The Legislature may amend section 1253.3(c) to extend benefits eligibility to these latter employees during summer sessions regardless of whether the session is a "regular" term.

## CONCLUSION

We hold that a summer session does not fall within the period of unemployment benefits ineligibility mandated by section 1253.3 if the summer session is a "regular" term — that is, if the summer session, as a whole, resembles the other academic terms of the school year in terms of enrollment, staffing, budget, instructional program, or other objective characteristics. UESF notes that "SFUSD [has] offered no evidence that the summer session was any different from the sessions that ended in May 2011 or began in August 2011." But the record contains little evidence, one way or the other, on the objective characteristics of the summer sessions at issue, and

the parties, with the guidance of today's opinion, may introduce such evidence on remand.

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** United Educators of San Francisco AFT/CFT, AFL-CIO, NEA/CTA v. California Unemployment Insurance Appeals Board

---

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 247 Cal.App.4th 1235
**Rehearing Granted**

---

**Opinion No.** S235903
**Date Filed:** January 16, 2020

---

**Court:** Superior
**County:** San Francisco
**Judge:** Richard B. Ulmer, Jr.

---

**Counsel:**

Weinberg, Roger & Rosenfeld, Stewart Weinberg and David A. Rosenfeld for Plaintiff and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Janill L. Richards, Principal Deputy Solicitor General, Julie Weng-Gutierrez, Assistant Attorney General, Samuel P. Siegel, Associate Deputy Solicitor General, Susan M. Carson, Gregory D. Brown and Beverley R. Meyers, Deputy Attorneys General, for Defendant, Cross-defendant and Appellant and for Defendant and Appellant.

Rothner, Segall & Greenstone, Glenn Rothner; David J. Strom and Samuel J. Lieberman for the American Federation of Teachers, AFL-CIO, as Amicus Curiae on behalf of Plaintiff and Appellant.

Burke, Williams & Sorensen and John R. Yeh for Real Party in Interest and Respondent and for Plaintiff and Respondent.

Marion L. McWilliams, Michael L. Smith and Amy D. Brandt for Oakland Unified School District as Amicus Curiae on behalf of Real Party in Interest and Respondent and Plaintiff and Respondent.

Liebert Cassidy Whitmore, Laura Schulkind, Michael D. Youril; Keith Bray, Joshua R. Daniels and Michael Ambrose for California School Boards Association's Education Legal Alliance as Amicus Curiae on behalf of Real Party in Interest and Respondent and Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David A. Rosenfeld
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501
(510) 337-1001

Gregory D. Brown
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 703-5461

John R. Yeh
Burke, Williams & Sorensen, LLP
1503 Grant Road, Suite 200
Mountain View, CA 94040-3270
(650) 327-2672